## PIERCE ET AL. *v.* UNITED STATES.

ERROR TO THE DISTRICT COURT OF THE UNITED STATES
FOR THE NORTHERN DISTRICT OF NEW YORK.

. No. 234.   Argued November 18, 19, 1919.—Decided March 8, 1920.

The decision in another case of a constitutional question which formed
the jurisdictional basis for a direct writ of error previously sued out
under Jud. Code, § 238, does not divest this court of its jurisdiction
to determine the other questions raised in the record.  P. 242.

In order to constitute a conspiracy, within § 4 of the Espionage Act,
to commit a substantive offense defined in § 3, it is not essential that
the conspirators shall have agreed in advance upon the precise
method of violating the law; and, while the averment of the con-
spiracy cannot be aided by the allegations of overt acts and the
.conspiracy is not punishable unless such acts were committed, they
need not be in themselves criminal, still less constitute the very
crime which is the object of the conspiracy.  P. 243.

Averments in such an indictment that defendants unlawfully, wilfully
or feloniously committed the forbidden acts import an unlawful
motive.  P. 244.

. Whether statements contained in a pamphlet circulated by defendants
tended to produce the consequences forbidden by the Espionage Act,
(§ 3), as alleged, *held* a matter to be determined by the jury, and not
by the court on demurrer to the indictment.  *Id.*

Evidence in the case examined and *held* sufficient to warrant the jury's
finding that defendants, in violation of the Espionage Act, con-
spired to commit, and committed, the offense of attempting to cause
insubordination and disloyalty and refusal of duty in the military
and naval forces, and made and conveyed false statements with
intent to interfere with the operation and success of those forces, in
the war with Germany, by circulating pamphlets and other printed
matter tending in the circumstances to produce those results.  P. 245.

The fact that defendants distributed such pamphlets with a full under-
standing of their contents furnished of itself a ground for attributing
to them an intent, and for finding that they attempted, to bring
about any and all such consequences as reasonably might be antici-
pated from their distribution.  P. 249.

In a prosecution for circulating false statements with intent to interfere with the operation and success of the military and naval forces, in violation of the Espionage Act, § 3, where the falsity of the statements in question appears plainly, as a matter of common knowledge and public fact, other evidence on that subject is not needed in order to sustain a verdict of guilty. P. 250.

In such cases it is for the jury to determine whether the statements circulated should be taken literally or in an innocent, figurative sense, in view of the class and character of the people among whom the statements were circulated. P. 251.

To circulate such false statements recklessly, without effort to ascertain the truth, is equivalent to circulating them with knowledge of their falsity. *Id.*

The fact that the statements in question do not, to the common understanding, purport to convey anything new but only to interpret or comment on matters pretended to be facts of public knowledge, does not remove them from the purview of § 3 of the Espionage Act. P. 252.

The insufficiency of one of several counts of an indictment upon which concurrent sentences have been imposed does not necessitate reversal where the other counts sustain the total punishment inflicted. *Id.*

Affirmed.

THE case is stated in the opinion.

*Mr. Frederick A. Mohr* for plaintiffs in error.

*Mr. Assistant Attorney General Stewart,* with whom *Mr. W. C. Herron* was on the brief, for the United States.

MR. JUSTICE PITNEY delivered the opinion of the court.

Plaintiffs in error were jointly indicted October 2, 1917, in the United States District Court for the Northern District of New York, upon six counts, of which the 4th and 5th were struck out by agreement at the trial and the 1st is now abandoned by the Government.

The 2d count charged that throughout the period from

April 6, 1917, to the date of the presentation of the indictment, the United States being at war with the Imperial German Government, defendants at the City of Albany, in the Northern District of New York and within the jurisdiction, etc., unlawfully and feloniously conspired together and with other persons to the grand jurors unknown to commit an offense against the United States, to wit, "The offense of unlawfully, feloniously and willfully attempting to cause insubordination, disloyalty and refusal of duty in the military and naval forces of the United States when the United States was at war and to the injury of the United States in, through, and by personal solicitations, public speeches and distributing and publicly circulating throughout the United States certain articles printed in pamphlets called 'The Price We Pay,' which said pamphlets were to be distributed publicly throughout the Northern District of New York, and which said solicitations, speeches, articles and pamphlets would and should persistently urge insubordination, disloyalty and refusal of duty in the said military and naval forces of the United States to the injury of the United States and its military and naval service and failure and refusal on the part of available persons to enlist therein and should and would through and by means above mentioned obstruct the recruiting and enlistment service of the United States when the United States was at war to the injury of that service and of the United States." For overt acts it was alleged that certain of the defendants, in the City of Albany at times specified, made personal solicitations and public speeches, and especially that they published and distributed to certain persons named and other persons to the grand jurors unknown certain pamphlets headed "The Price We Pay," a copy of which was annexed to the indictment and made a part of it.

The 3d count charged that during the same period and on August 26, 1917, the United States being at war, etc.,

defendants at the City of Albany, etc., wilfully and feloniously made, distributed, and conveyed to certain persons named and others to the grand jurors unknown certain false reports and false statements in certain pamphlets attached to and made a part of the indictment and headed "The Price We Pay," which false statements were in part as shown by certain extracts quoted from the pamphlet, with intent to interfere with the operation and success of the military and naval forces of the United States.

The 6th count charged that at the same place, during the same period and on August 27, 1917, while the United States was at war, etc., defendants willfully and feloniously attempted to cause insubordination, disloyalty, mutiny, and refusal of duty in the military and naval service of the United States by means of the publication, circulation, and distribution of "The Price We Pay" to certain persons named and others to the grand jurors unknown.

A general demurrer was overruled, whereupon defendants pleaded not guilty and were put on trial together, with the result that Pierce, Creo, and Zeilman were found guilty upon the 1st, 2d, 3d and 6th counts, and Nelson upon the 3d count only. Each defendant was separately sentenced to a term of imprisonment upon each count on which he had been found guilty; the several sentences of Pierce, Creo, and Zeilman, however, to run concurrently.

The present direct writ of error was sued out under § 238, Judicial Code, because of contentions that the Selective Draft Act and the Espionage Act were unconstitutional. These have since been set at rest. *Selective Draft Law Cases*, 245 U. S. 366; *Schenck* v. *United States*, 249 U. S. 47, 51; *Frohwerk* v. *United States*, 249 U. S. 204; *Debs* v. *United States*, 249 U. S. 211, 215. But our jurisdiction continues for the purpose of disposing of other questions raised in the record. *Brolan* v. *United States*, 236 U. S. 216.

It is insisted that there was error in refusing to sustain the demurrer, and this on the ground that (1) the facts and circumstances upon which the allegation of conspiracy rested were not stated; (2) there was a failure to set forth facts or circumstances showing unlawful motive or intent; (3) there was a failure to show a clear and present danger that the distribution of the pamphlet would bring about the evils that Congress sought to prevent by the enactment of the Espionage Act; and (4) that the statements contained in the pamphlet were not such as would naturally produce the forbidden consequences.

What we have recited of the 2d count shows a sufficiently definite averment of a conspiracy and overt acts under the provisions of Title I of the Espionage Act.[1] The 4th section makes criminal a conspiracy "to violate the provisions of sections two or three of this title," provided one or more of the conspirators do any act to

---

[1] Extract from Act of June 15, 1917, c. 30, 40 Stat. 217, 219.

Sec. 3. Whoever, when the United States is at war, shall willfully make or convey false reports or false statements with intent to interfere with the operation or success of the military or naval forces of the United States or to promote the success of its enemies and whoever, when the United States is at war, shall willfully cause or attempt to cause insubordination, disloyalty, mutiny, or refusal of duty, in the military or naval forces of the United States, or shall willfully obstruct the recruiting or enlistment service of the United States, to the injury of the service or of the United States, shall be punished by a fine of not more than $10,000 or imprisonment for not more than twenty years, or both.

Sec. 4. If two or more persons conspire to violate the provisions of sections two or three of this title, and one or more of such persons does any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be punished as in said sections provided in the case of the doing of the act the accomplishment of which is the object of such conspiracy. Except as above provided conspiracies to commit offenses under this title shall be punished as provided by section thirty-seven of the Act to codify, revise, and amend the penal laws of the United States approved March fourth, nineteen hundred and nine.

effect the object of the conspiracy. Such a conspiracy, thus attempted to be carried into effect, is none the less punishable because the conspirators fail to agree in advance upon the precise method in which the law shall be violated. It is true the averment of the conspiracy cannot be aided by the allegations respecting the overt acts. *United States* v. *Britton,* 108 U. S. 199, 205; *Joplin Mercantile Co.* v. *United States,* 236 U. S. 531, 536. On the other hand, while under § 4 of the Espionage Act, as under § 37 of the Criminal Code, a mere conspiracy, without overt act done in pursuance of it, is not punishable criminally, yet the overt act need not be in and of itself a criminal act; still less need it constitute the very crime that is the object of the conspiracy. *United States* v. *Rabinowich,* 238 U. S. 78, 86; *Goldman* v. *United States,* 245 U. S. 474, 477.

As to the second point: Averments that defendants unlawfully, willfully, or feloniously committed the forbidden acts fairly import an unlawful motive; the 3rd count specifically avers such a motive; the conspiracy charged in the 2d and the willful attempt charged in the 6th necessarily involve unlawful motives.

The third and fourth objections point to no infirmity in the averments of the indictment. Whether the statements contained in the pamphlet had a natural tendency to produce the forbidden consequences, as alleged, was a question to be determined not upon demurrer but by the jury at the trial. There was no error in overruling the demurrer.

Upon the trial, defendants' counsel moved that the jury be directed to acquit the defendants, upon the ground that the evidence was not sufficient to sustain a conviction. Under the exceptions taken to the refusal of this motion it is urged that there was no proof (a) of conspiracy, (b) of criminal purpose or intent, (c) of the falsity of the statements contained in the pamphlet cir-

culated, (d) of knowledge on defendants' part of such falsity, or (e) of circumstances creating a danger that its circulation would produce the evils which Congress sought to prevent; and further (f) that the pamphlet itself could not legitimately be construed as tending to produce the prohibited consequences.

The pamphlet—"The Price We Pay"—was a highly colored and sensational document, issued by the national office of the Socialist Party at Chicago, Illinois, and fairly to be construed as a protest against the further prosecution of the war by the United States. It contained much in the way of denunciation of war in general, the pending war in particular; something in the way of assertion that under Socialism things would be better; little or nothing in the way of fact or argument to support the assertion. It is too long to be quoted in full. The following extracts will suffice; those indicated by italics being the same that were set forth in the body of the 3d count:

"Conscription is upon us; the draft law is a fact!

"*Into your homes the recruiting officers are coming. They will take your sons of military age and impress them into the army;*

"Stand them up in long rows, break them into squads and platoons, teach them to deploy and wheel;

"Guns will be put into their hands; they will be taught not to think, only to obey without questioning.

"Then they will be shipped thru the submarine zone by the hundreds of thousands to the bloody quagmire of Europe.

"Into that seething, heaving swamp of torn flesh and floating entrails they will be plunged, in regiments, divisions and armies, screaming as they go.

"Agonies of torture will rend their flesh from their sinews, will crack their bones and dissolve their lungs; every pang will be multiplied in its passage to you.

"Black death will be a guest at every American fire-side. Mothers and fathers and sisters, wives and sweet-hearts will know the weight of that awful vacancy left by the bullet which finds its mark.

*"And still the recruiting officers will come; seizing age after age, mounting up to the elder ones and taking the younger ones as they grow to soldier size;*

"And still the toll of death will grow.

\*      \*      \*      \*      · \*      \*      \*      \*

"The manhood of America gazes at that seething, heaving swamp of bloody carrion in Europe, and say 'Must we—be that!'

"You cannot avoid it; you are being dragged, whipped, lashed, hurled into it; Your flesh and brains and entrails· must be crushed out of you and poured into that mass of festering decay;

"It is the price you pay for your stupidity—you who have rejected Socialism.

\*      ⁄ \*      \*      \*      \*      \*      \*      \*

"Food prices go up like skyrockets; and show no sign of bursting and coming down.

\*      \*      \*      \*      \*      \*      \*      \*

*"The Attorney General ·of the United States is so busy sending to prison men who do not stand up when. the Star Spangled Banner is played, that he has no time to protect the food supply from gamblers.*

\*      ,\*      \*      \*      \*      \*      \*      \*

"This war began over commercial routes and ports and rights; and underneath all the talk about democracy versus autocracy, you hear a continual note, and under-current, a subdued refrain;

"'Get ready for the commercial war that will follow this war.'

"Commercial war preceded this war; it gave rise to this war; it now gives point and meaning to this war;

\*      \*      \*      \*      \*      \*      \*      \*

"This, you say, is a war for the rights of small nations and the first land sighted when you sail across the Atlantic is the nation of Ireland, which has suffered from England for three centuries more than what Germany has inflicted upon Belgium for three years.

"But go to it! Believe everything you are told—you always have, and doubtless always will, believe them.

\*     \*     \*     \*     \*     \*     \*     \*

"For this war — as every one who thinks or knows anything will say, whenever truth-telling becomes safe and possible again,—This war is to determine the question, whether the chambers of commerce of the allied nations or of the Central Empires have the superior right to exploit undeveloped countries.

"It is to determine whether interest, dividends and profits shall be paid to investors speaking German or those speaking English and French.

*"Our entry into it was determined by the certainty that if the allies do not win, J. P. Morgan's loans to the allies will be repudiated, and those American investors who bit on his promises would be hooked."*

These expressions were interspersed with suggestions that the war was the result of the rejection of Socialism, and that Socialism was the "salvation of the human race."

It was in evidence that defendants were members of the Socialist Party—a party "organized in locals throughout the country"—and affiliated with a local branch in the City of Albany. There was evidence that at a meeting of that branch, held July 11, 1917, at which Pierce was present, the question of distributing "The Price We Pay " was brought up, sample copies obtained from the national organization at Chicago having been produced for examination and consideration; that the pamphlet was discussed, as well as the question of ordering a large number of copies from the national organization for distribution; it was stated that criminal proceed-

ings were pending in the United States District Court for the District of Maryland against parties indicted for distributing the same pamphlet; some of the members present, one of them an attorney, advised against its distribution, and a motion was adopted not to distribute it until it was known to be legal. However, some action appears to have been taken towards procuring copies for distribution, for on July 17th a large bundle of them, said to have been 5,000 copies, was delivered at Pierce's house by the literature agent of the Albany local. At a meeting held July 25 the subject was again brought up, it having become known that in the criminal proceedings before mentioned the court had directed a verdict of acquittal; thereupon the resolution of July 11 was rescinded and distributors were called for. On July 29, defendants Pierce, Creo, and Zeilman met at Pierce's house about half past 5 o'clock in the morning, and immediately began distributing the pamphlets in large numbers throughout the City of Albany. Each of them took about 500 copies, and having agreed among themselves about the division of the territory, they went from house to house, leaving a copy upon each doorstep. They repeated this on successive Sundays until August 26, when they were arrested. Nelson acted with them as a distributor on the latter date, and perhaps on one previous occasion.

There was evidence that in some instances a leaflet entitled "Protect Your Rights," and bearing the Chicago address of the national office of the Socialist Party, was folded between the pages of the pamphlet. The leaflet was a fervid appeal to the reader to join the Socialist Party, upon the ground that it was the only organization that was opposing the war. It declared among other things: "This organization has opposed war and conscription. It is still opposed to war and conscription. . . . Do you want to help in this struggle? . . . The party needs you now as it never needed you before. You

need the party now as you never needed it before. Men are going to give up their lives for a cause which you are convinced is neither great or noble, will you then begrudge your best efforts to the cause that you feel certain is both great and noble and in which lives the only hope and promise of the future? " And there was evidence of declarations made by Pierce on the 16th and 17th of August, amounting to an acknowledgment of a treasonable purpose in opposing the draft, which he sought to excuse on the ground that he had "no use for England."

It was shown without dispute that defendants distributed the pamphlet—"The Price We Pay "—with full understanding of its contents; and this of itself furnished a ground for attributing to them an intent to bring about, and for finding that they attempted to bring about, any and all such consequences as reasonably might be anticipated from its distribution. If its probable effect was at all disputable, at least the jury fairly might believe that, under the circumstances existing, it would have a tendency to cause insubordination, disloyalty, and refusal of duty in the military and naval forces of the United States; that it amounted to an obstruction of the recruiting and enlistment service; and that it was intended to interfere with the success of our military and naval forces in the war in which the United States was then engaged. Evidently it was intended, as the jury found, to interfere with the conscription and recruitment services; to cause men eligible for the service to evade the draft; to bring home to them, and especially to their parents, sisters, wives, and sweethearts, a sense of impending personal loss, calculated to discourage the young men from entering the service; to arouse suspicion as to whether the chief law officer of the Government was not more concerned in enforcing the strictness of military discipline than in protecting the people against improper speculation in their food supply; and to produce a belief that our

participation in the war was the product of sordid and
sinister motives, rather than a design to protect the in-
terests and maintain the honor of the United States.

What interpretation ought to be placed upon the pamph-
let, what would be the probable effect of distributing it
in the mode adopted, and what were defendants' motives
in doing this, were questions for the jury, not the court,
to decide. Defendants took the witness-stand and sever-
ally testified, in effect, that their sole purpose was to gain
converts for Socialism, not to interfere with the operation
or success of the naval or military forces of the United
States. But their evidence was far from conclusive, and
the jury very reasonably might find—as evidently they
did—that the protestations of innocence were insincere,
and that the real purpose of defendants—indeed, the
real object of the pamphlet—was to hamper the Govern-
ment in the prosecution of the war.

Whether the printed words would in fact produce as a
proximate result a material interference with the recruiting
or enlistment service, or the operation or success of the
forces of the United States, was a question for the jury to
decide in view of all the circumstances of the time and con-
sidering the place and manner of distribution. *Schenck*
v. *United States*, 249 U. S. 47, 52; *Frohwerk* v. *United
States*, 249 U. S. 204, 208; *Debs* v. *United States*, 249 U. S.
211, 215.

Concert of action on the part of Pierce, Creo, and Zeil-
man clearly appeared, and, taken in connection with the
nature of the pamphlet and their knowledge of its con-
tents, furnished abundant evidence of a conspiracy and
overt acts to sustain their conviction upon the second
count.

The validity of the conviction upon the third count
(the only one that includes Nelson), depends upon whether
there was lawful evidence of the falsity of the statements
contained in the pamphlet and tending to show that,

knowing they were false, or disregarding their probable falsity, defendants willfully circulated it, with intent to interfere with the operation or success of the military or naval forces of the United States. The criticism of the evidence admitted to show the untruth of the statements about the Attorney General and about J. P. Morgan's loans to the Allies is not well founded; the evidence was admissible; but we hardly see that it was needed to convince a reasonable jury of the falsity of these and other statements contained in the pamphlet. Common knowledge (not to mention the President's Address to Congress ··of April 2, 1917, and the Joint Resolution of April 6 declaring war, which were introduced in evidence) would have sufficed to show at least that the statements as to the causes that led to the entry of the United States into the war against Germany were grossly false; and such common knowledge went to prove also that defendants knew they were untrue. That they were false if taken in a literal sense hardly is disputed. It is argued that they ought not to be taken literally. But when it is remembered that the pamphlet was intended to be circulated, and so far as defendants acted in the matter was circulated, among readers of all classes and conditions, it cannot be said as matter of law that no considerable number of them would understand the statements in a literal sense and take them seriously. The jury was warranted in finding the statements false in fact, and known to be so by the defendants, or else distributed recklessly, without effort to ascertain the truth (see *Cooper* v. *Schlesinger,* 111 U. S. 148, 155), and circulated willfully in order to interfere with the success of the forces of the United States. This is sufficient to sustain the conviction of all of the defendants upon the third count.

There being substantial evidence in support of the charges, the court would have erred if it had peremptorily directed an acquittal upon any of the counts. The

question whether the effect of the evidence was such as to overcome any reasonable doubt of guilt was for the jury, not the court, to decide.

It is suggested that the clause of § 3—"Whoever, when the United States is at war, shall willfully make or convey false reports or false statements with intent to interfere with the operation or success of the military or naval forces of the United States or to promote the success of its enemies"—cannot be construed to cover statements that on their face, to the common understanding, do not purport to convey anything new, but only to interpret or comment on matters pretended to be facts of public knowledge; and that however false the statements and with whatever evil purpose circulated, they are not punishable if accompanied with a pretense of commenting upon them as matters of public concern. We cannot accept such a construction; it unduly restricts the natural meaning of the clause, leaves little for it to operate upon, and disregards the context and the circumstances under which the statute was passed. In effect, it would allow the professed advocate of disloyalty to escape responsibility for statements however audaciously false, so long as he did but reiterate what had been said before; while his ignorant dupes, believing his statements and thereby persuaded to obstruct the recruiting or enlistment service, would be punishable by fine or imprisonment under the same section.

Other assignments of error pointing to rulings upon evidence and instructions given or refused to be given to the jury are sufficiently disposed of by what we have said.

The conceded insufficiency of the first count of the indictment does not warrant a reversal, since the sentences imposed upon Pierce, Creo, and Zeilman did not exceed that which lawfully might have been imposed under the second, third, or sixth counts, so that the concurrent sentence under the first count adds nothing to their punish-

ment.   *Claassen* v. *United States*, 142 U. S. 140, 146; *Evans* v. *United States*, (2 cases) 153 U. S. 584, 595, 608; *Putnam* v. *United States*, 162 U. S. 687, 714; *Abrams* v. *United States*, 250 U. S. 616, 619.

*Judgments affirmed.*

MR. JUSTICE BRANDEIS, dissenting, delivered the following opinion in which MR. JUSTICE HOLMES concurred.

What is called "distributing literature" is a means commonly used by the Socialist Party to increase its membership and otherwise to advance the cause it advocates.   To this end the national organization with headquarters at Chicago publishes such "literature" from time to time and sends sample copies to the local organizations.   These, when they approve, purchase copies and call upon members to volunteer for service in making the distribution locally.   Sometime before July 11, 1917, a local of the Socialist Party at Albany, New York, received from the national organization sample copies of a four-page leaflet entitled "The Price We Pay," written by Irwin St. John Tucker, an Episcopal clergyman and a man of sufficient prominence to have been included in the 1916–1917 edition of "Who's Who in America."   The proposal to distribute this leaflet came up for action at a meeting of the Albany local held on July 11, 1917.   A member who was a lawyer called attention to the fact that the question whether it was legal to distribute this leaflet was involved in a case pending in Baltimore in the District Court of the United States; and it was voted "not to distribute 'The Price We Pay' until we know if it is legal."   The case referred to was an indictment under the Selective Draft Act for conspiracy to obstruct recruiting by means of distributing the leaflet.   Shortly after the July 11th meeting it became known that District Judge Rose had directed an acquittal in that case; and at the next meet-

_ing of the local, held July 25th, it was voted to rescind the motion "against distributing 'The Price We Pay' and call for distributors." Four members of the local, two of them native Americans, one a naturalized citizen, and the fourth a foreigner who had filed his first naturalization papers, volunteered as distributors. They distributed about five thousand copies by hand in Albany.

District Judge Rose in directing an acquittal had said of the leaflet in the Baltimore case:

"I do not think there is anything to go to the jury in this case.

"You may have your own opinions about that circular; I have very strong individual opinions about it, and as to the wisdom and fairness of what is said there; but so far as I can see it is principally a circular intended to induce people to subscribe to Socialist newspapers and to get recruits for the Socialist Party. I do not think that we ought to attempt to prosecute people for that kind of thing. It may be very unwise in its effect, and it may be unpatriotic at that particular time and place, but it would be going very far indeed, further, I think than any law that I know of would justify, to hold that there has been made out any case here even tending to show that there was an attempt to persuade men not to obey the law."

In New York a different view was taken; and an indictment in six counts was found against the four distributors. Two of the counts were eliminated at the trial. On the other four there were convictions, and on each a sentence of fine and imprisonment. But one of the four counts was abandoned by the Government in this court. There remain for consideration count three, which charges a violation of § 3 of the Espionage Act by making false reports and false statements, with the intent "to interfere with the operation and success of the military and naval forces"; and counts two and six, also involving § 3 of the Espionage Act, the one for conspiring, the other for at-

tempting, "to cause insubordination, disloyalty and refusal of duty in the military and naval forces." Demurrers to the several counts and motions that a verdict be directed for the several defendants were overruled.

In considering the several counts it is important to note that three classes of offences are included in § 3 of the Espionage Act, and that the essentials of liability under them differ materially. The first class, under which count three is drawn, is the offence of making or conveying false statements or reports with intent to interfere with the operations or success of the military and naval forces. The second, involved in counts two and six is that of attempting to cause insubordination, disloyalty, mutiny, or refusal of duty. With the third, that of obstructing the recruiting and enlistment service, we have, since the abandonment of the first count, no concern here. Although the uttering or publishing of the words charged be admitted, there necessarily arises in every case—whether the offence charged be of the first class or of the second—the question whether the words were used "in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evil that Congress has a right to prevent," *Schenck* v. *United States*, 249 U. S. 47, 52; and also the question whether the act of uttering or publishing was done willfully, that is, with the intent to produce the result which the Congress sought to prevent. But in cases of the first class three additional elements of the crime must be established, namely:

(1) The statement or report must be of something capable of being proved false in fact. The expression of an opinion, for instance, whether sound or unsound, might conceivably afford a sufficient basis for the charge of attempting to cause insubordination, disloyalty or refusal of duty, or for the charge of obstructing recruiting; but, because an opinion is not capable of being proved

false in fact, a statement of it cannot be made the basis of a prosecution of the first class.

(2) The statement or report must be proved to be false.

(3) The statement or report must be known by the defendant to be false when made or conveyed.

In the case at bar the alleged offence consists wholly in distributing leaflets which had been written and published by others. The fact of distribution is admitted. But every other element of the two classes of crime charged must be established in order to. justify conviction. With unimportant exceptions to be discussed later, the only evidence introduced to establish the several elements of both of the crimes charged is the leaflet itself; and the leaflet is unaffected by extraneous evidence which might give to words used therein special meaning or effect. In order to determine whether the leaflet furnishes any evidence to establish any of, the above enumerated ele- ments of the offences charged, the whole leaflet must necessarily be read. It is as follows:

## "THE PRICE WE PAY.

### By Irwin St. John Tucker.

#### I.

"Conscription is upon us: the draft law is a fact!

Into your homes the recruiting officers are coming. They will take your sons of military age and impress them into the army;

Stand them up in long rows, break them into squads and platoons, teach them to deploy and wheel;

Guns will be put into their hands; they will be taught not to think, only to obey without questioning.

Then they will be shipped thru the submarine zone by the hundreds of thousands to the bloody quagmire of Europe.

Into that seething, heaving swamp of torn flesh and

floating entrails they will be plunged, in regiments, divisions and armies, screaming as they go.

Agonies of torture will rend their flesh from their sinews, will crack their bones and dissolve their lungs; every pang will be multiplied in its passage to you.

Black death will be a guest at every American fireside. Mothers and fathers and sisters, wives and sweethearts will know the weight of that awful vacancy left by the bullet which finds its mark.

And still the recruiting officers will come; seizing age after age, mounting up to the elder ones and taking the younger ones as they grow to soldier size;

And still the toll of death will grow.

Let them come! Let death and desolation make barren every Home! Let the agony of war crack every parent's heart! Let the horrors and miseries of the world-downfall swamp the happiness of every hearthstone!

Then perhaps you will believe what we have been telling you! For war is the price of your stupidity, you who have rejected Socialism!

## II.

"Yesterday I saw moving pictures of the Battle of the Somme. A company of Highlanders was shown, young and handsome in their kilts and brass helmets and bright plaids.

They laughed and joked as they stood on the screen in their ranks at ease, waiting the command to advance.

The camera shows rank after rank, standing strong and erect, smoking and chaffing with one another;

Then it shows a sign: 'Less than 20 per cent. of these soldiers were alive at the close of the day.'

Only one in five remained of all those laddies, when sunset came, the rest were crumpled masses of carrion under their torn plaids.

Many a highland home will wail and croon for many a

year, because of these crumpled masses of carrion, wrapped in their plaids, upon a far French hillside.

I saw a regiment of Germans charging downhill against machine gunfire.   They melted away like snowflakes falling into hot water.

The hospital camps were shown, with hundreds and thousands of wounded men in all stages of pain and suffering, herded like animals, milling around like cattle in the slaughter pens.

All the horror and agony of war were exhibited; and at the end a flag was thrown on the screen and a proclamation said: 'Enlist for your Country!'   The applause was very thin and scattering; and as we went out, most of the men shook their heads and said:

'That's a hell of a poor recruiting scheme!'

For the men of this land have been fed full with horror during the past three years; and tho the call for volunteers has become wild, frantic, desperate; tho the posters scream from every billboard, and tho parades and red fire inflame the atmosphere in every town;

The manhood of America gazes at that seething, heaving swamp of bloody carrion in Europe, and say 'Must we—be that!'

You cannot avoid it; you are being dragged, whipped, lashed, hurled into it; Your flesh and brains and entrails must be crushed out of you and poured into that mass of festering decay;

It is the price you pay for your stupidity—you who have rejected Socialism.

### III.

"Food prices go up like skyrockets; and show no sign of bursting and coming down.

Wheat, corn, potatoes, are far above the Civil War mark; eggs, butter, meat—all these things are almost beyond a poor family's reach.

The Attorney General of the United States is so busy sending to prison men who do not stand up when the Star Spangled Banner is played, that he has no time to protect the food supply from gamblers.

Starvation begins to stare us in the face—and we, people of the richest and most productive land on earth are told to starve ourselves yet further because our allies must be fed.

Submarines are steadily sending to the fishes millions of tons of food stuffs; and still we build more ships, and send more food, and more and more is sunk;

Frantically we grub in the earth and sow and tend and reap; and then as frantically load the food in ships, and then as frantically sink with them—

We, the 'civilized nations' of the world!

While the children of the poor clamor for their bread and the well to do shake their heads and wonder what on earth the poor folks are doing;

The poor folks are growling and muttering with savage side-long glances, and are rolling up their sleeves.

For the price they pay for their stupidity is getting beyond their power to pay!

## IV.

"Frightful reports are being made of the ravages of venereal diseases in the army training camps, and in the barracks where the girl munition workers live.

One of the great nations lost more men thru loathsome immoral diseases than on the firing line, during the first 18 months of the war.

Back from the Mexican border our boys come, spreading the curse of the great Black Plague among hundreds of thousands of homes; blasting the lives of innocent women and unborn babes,

Over in Europe ten millions of women are deprived of their husbands, and fifty millions of babies can never be;

Of those women who will have their mates given back to them, there are twenty millions who will have ruined wrecks of men; mentally deranged, physically broken, morally rotten;

Future generations of families are made impossible; blackness and desolation instead of happiness and love will reign where the homes of the future should be;

And all because you believed the silly lie, that 'Socialism would destroy the home!'

Pound on, guns of the embattled host; wreck yet more homes, kill yet more husbands and fathers, rob yet more maidens of their sweethearts, yet more babies of their fathers;

That is the price the world pays for believing the monstrous, damnable, outrageous lie that Socialism would destroy the home!

Now the homes of the world are being destroyed; every one of them would have been saved by Socialism. But you would not believe. Now pay the price!

### V.

"This war, you say, is all caused by the Kaiser; and we are fighting for democracy against autocracy. Once dethrone the Kaiser and there will be permanent peace.

That is what they said about Napoleon. And in the century since Napoleon was overthrown there has been more and greater wars than the world ever saw before.

There were wars before Germany ever existed; before Rome ruled; before Egypt dominated the ages.

War has been universal; and the cause of war is always the same. Somebody wanted something somebody else possessed and they fought over the ownership of it.

This war began over commercial routes and ports and rights; and underneath all the talk about democracy versus autocracy, you hear a continual note, and undercurrent, a subdued refrain;

'Get ready for the commercial war that will follow this war.'

Commercial war preceded this war; it gave rise to this war; it now gives point and meaning to this war;

And as soon as the guns are stilled and the dead are buried, commercial forces will prepare for the next bloody struggle over routes and ports and rights, coal mines ar d railroads;

For these are the essence of this, as of all other wars!

This, you say, is a war for the rights of small nations and the first land sighted when you sail across the Atlantic is the nation of Ireland, which has suffered from England for three centuries more than what Germany has inflicted upon Belgium for three years.

But go to it! Believe everything you are told—you always have and doubtless always will, believe them.

Only do retain this much reason; when you have paid the price, the last and uttermost price; and have not received what you were told you were fighting for—namely Democracy—

Then remember that the price you paid was not the purchase price for justice, but the penalty price for your stupidity!

## VI.

"We are beholding the spectacle of whole nations working as one person for the accomplishment of a single end—namely killing.

Every man, every woman, every child, must 'do his bit' in the service of destruction.

We have been telling you for, lo, these many years that the whole nation could be mobilized and every man, woman and child induced to do his bit for the service of humanity but you have laughed at us.

Now you call every person traitor, slacker, pro-enemy who will not go crazy on the subject of killing; and you

have turned the whole energy of the nations of the world into the service of their kings for the purpose of killing—killing—killing.

Why would you not believe us when we told you that it was possible to coöperate for the saving of life?

Why were you not interested when we begged you to work all together to build, instead to destroy? To preserve, instead of to murder?

Why did you ridicule us and call us impractical dreamers when we prophesied a world-state of fellowworkers, each man creating for the benefit of all the world, and the whole world creating for the benefit of each man?

Those idle taunts, those thoughtless jeers, that refusal to listen, to be fair-minded—you are paying for them now.

— Lo, the price you pay! Lo, the price your children will pay. Lo, the agony, the death, the blood, the unforgettable sorrow,—

The price of your stupidity!

For this war—as every one who thinks or knows anything will say, whenever truth-telling becomes safe and possible again,—This war is to determine the question, whether the chambers of commerce of the allied nations or of the Central Empires have the superior right to exploit undeveloped countries.

It is to determine whether interest, dividends and profits shall be paid to investors speaking German or those speaking English and French.

Our entry into it was determined by the certainty that if the allies do not win, J. P. Morgan's loans to the allies will be repudiated, and those American investors who bit on his promises would be hooked.

Socialism would have settled that question; it would determine that to every producer shall be given all the value of what he produces; so that nothing would be left over for exploiters or investors.

With that great question settled there would be no cause for war.

Until the question of surplus profits is settled that way, wars will continue; each war being the prelude to a still vaster and greater outburst of hell;

Until the world becomes weary of paying the stupendous price for its own folly;

Until those who are sent out to maim and murder one another for the profit of bankers and investors determine to have and to hold what they have fought for;

Until money is no more sacred than human blood;

Until human life refuses to sacrifice itself for private gain;

Until by the explosion of millions of tons of dynamite the stupidity of the human race is blown away, and Socialism is known for what it is, the salvation of the human race;

Until then—you will keep on paying the price!

IF THIS INTERESTS YOU, PASS IT ON.

               *      *      *      *      *      *      *      *

Subscribe to The American Socialist, published weekly by the National Office, Socialist Party, 803 West Madison Street, Chicago, Ill., 50 cents per year, 25 cents for 6 months.  It is a paper without a muzzle.

               *      *      *      *      *      *      *      *

Cut this out or copy it and send it to us.  We will see that you promptly receive the desired information.

               *      *      *      *      *      *      *      *

To the National Office, Socialist Party, 803 W. Madison St., Chicago, Ill.

I am interested in the Socialist Party and its principles. Please send me samples of its literature.

Name. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Address. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

City. . . . . . . . . . State. . . . . . . . . . . . . ."

*First:*  From this leaflet, which is divided into six

chapters, there are set forth in count three, five sentences as constituting the false statements or reports wilfully conveyed by defendants with the intent to interfere with the operation and success of the military and naval forces of the United States.

(a)  Two sentences are culled from the first chapter. They follow immediately after the words: "Conscription is upon us; the draft law is a fact"—and a third sentence culled follows a little later.  They are:

"Into your homes the recruiting officers are coming. They will take your sons of military age and impress them into the army. . . . And still the recruiting officers will come; seizing age after age, mounting up to the elder ones and taking the younger ones as they grow to soldier size."

To prove the alleged falsity of these statements the Government gravely called as a witness a major in the regular army with 28 years' experience, who has been assigned since July 5, 1917, to recruiting work.  He testified that "recruiting" has to do with the volunteer service and has nothing to do with the drafting system and that the word impress has no place in the recruiting service.  The subject of his testimony was a matter not of fact but of law; and as a statement of law it was erroneous.  That "recruiting is gaining fresh supplies for the forces, as well by draft as otherwise" had been assumed by the Circuit Court of Appeals for that circuit in *Masses Publishing Co.* v. *Patten*, 246 Fed. Rep. 24 (decided eleven days before this testimony was given), and was later expressly held by this court in *Schenck* v. *United States*, 249 U. S. 47, 53.  The third of the sentences charged as false was obviously neither a statement nor a report, but a prediction; and it was later verified.[1]  That the prediction

---

[1] On May 20, 1918, c. 79, 40 Stat. 557, Congress, by joint resolution, extended the draft to males who had since June 5, 1917, attained the age of twenty-one and authorized the President to extend it to those

made in the leaflet was later verified is, of course, immaterial; but the fact shows the danger of extending beyond its appropriate sphere the scope of a charge of falsity.

(*b*) The fourth sentence set forth in the third count as a false statement was culled from the third chapter of the leaflet and is this:

' "The Attorney General of the United States is so busy sending to prison men who do not stand up when the Star Spangled Banner is played, that he has not time to protect the food supply from gamblers."

To prove the falsity of this statement the Government called the United States Attorney for that district who testified that no federal law makes it a crime not to stand up when the "Star Spangled Banner " is played and that he has no knowledge of any one being prosecuted for failure to do so. The presiding judge supplemented this testimony by a ruling that the Attorney General, like every officer of the Government, is presumed to do his duty and not to violate his duty and that this presumption should obtain unless evidence to the contrary was adduced. The Regulations of the Army (No. 378, Edition of 1913, p. 88) provide that if the National Anthem is played in any place those present, whether in uniform or in civilian clothes, shall stand until the last note of the anthem. The regulation is expressly limited in its operation to those belonging to the military service, although the practice was commonly observed by civilians throughout the war.

---

thereafter attaining that age. Under this act, June, 5, 1918, was fixed as the date for the Second Registration. Subsequently, August 24, 1918, was fixed for the supplemental registration of all coming of age between June 5, 1918, and August 24, 1918. 40 Stat. 1834; 40 Stat. 1781. By Act of August 31, 1918, c. 166, 40 Stat. 955, the provisions of the draft law were extended to persons between the ages of eighteen and forty-five. Under this act, September 12, 1918, was fixed as the date for the Third Registration. 40 Stat. 1840.

There was no federal law imposing such action upon them. The Attorney General, who does not enforce Army Regulations, was, therefore, not engaged in sending men to prison for that offence. But when the passage in question is read in connection with the rest of the chapter, it seems clear that it was intended, not as a statement of fact, but as a criticism of the Department of Justice for devoting its efforts to prosecutions for acts or omissions indicating lack of sympathy with the war, rather than to protecting the community from profiteering by prosecuting violators of the Food Control Act. (August 10, 1917, c. 53, 40 Stat. 276.) Such criticisms of governmental operations, though grossly unfair as an interpretation of facts or even wholly unfounded in fact, are not "false reports or false statements with intent to interfere with the operation or success of the military or naval forces."

(c) The remaining sentence, set forth in count three as a false statement, was culled from the sixth chapter of the leaflet and is this:

"Our entry into it was determined by the certainty that if the allies do not win, J. P. Morgan's loans to the allies will be repudiated, and those American investors who bit on his promises would be hooked."

To prove the falsity of this statement the Government introduced the address made by the President to Congress on April 2, 1917, which preceded the adoption of the Joint Resolution of April 6, 1917, declaring that a state of war exists between the United States and the Imperial German Government (c. 1, 40 Stat. 1). This so-called statement of fact—which is alleged to be false—is merely a conclusion or a deduction from facts. True it is the kind of conclusion which courts call a conclusion of fact, as distinguished from a conclusion of law; and which is sometimes spoken of as a finding of ultimate fact as distinguished from an evidentiary fact. But, in its essence it is the expression of a judgment—like the

statements of many so-called historical facts. To such conclusions and deductions the declaration of this court in *American School of Magnetic Healing* v. *McAnnulty*, 187 U. S. 94, 104, is applicable:

"There is no exact standard of absolute truth by which to prove the assertion false and a fraud. We mean by that to say that the claim of complainants cannot be the subject of proof as of an ordinary fact; it cannot be proved as a fact to be a fraud or false pretense or promise, nor can it properly be said that those who assume to heal bodily ills or infirmities by a resort to this method of cure are guilty of obtaining money under false pretenses, such as are intended in the statutes, which evidently do not assume to deal with mere matters of opinion upon subjects which are not capable of proof as to their falsity."

The cause of a war—as of most human action—is not single. War is ordinarily the result of many coöperating causes, many different conditions, acts and motives. Historians rarely agree in their judgment as to what was the determining factor in a particular war, even when they write under circumstances where detachment and the availability of evidence from all sources minimize both prejudice and other sources of error. For individuals, and classes of individuals, attach significance to those things which are significant to them. And, as the contributing causes cannot be subjected, like a chemical combination in a test tube, to qualitative and quantitative analysis so as to weigh and value the various elements, the historians differ necessarily in their judgments. One finds the determining cause of war in a great man, another in an idea, a belief, an economic necessity, a trade advantage, a sinister machination, or an accident. It is for this reason largely that men seek to interpret anew in each age, and often with each new generation, the important events in the world's history.

That all who voted for the Joint Resolution of April 6,

1917, did not do so for the reasons assigned by the President in his address to Congress on April 2, is demonstrated by the discussions in the House and in the Senate.[1]  That debate discloses also that both in the Senate and in the House the loans to the Allies and the desire to ensure their repayment in full were declared to have been instrumental in bringing about in our country the sentiment in favor of the war.[2]  However strongly we may believe

[1] See 55 Cong. Rec. 253, 254, 344, 354, 357, 407.

[2] Discussion in the Senate April 4, 1917:

"  .  .  .   there is no doubt in any mind but the enormous amount of money loaned to the allies in this country has been instrumental in bringing about a public sentiment in favor of our country taking a course that would make every bond worth a hundred cents on the dollar and making the payment of every debt certain and sure."  (55 Cong. Rec. p. 213.)

Discussion in the House April 5, 1917.

"Since the loan of $500,000,000 was made by Morgan to the allies their efforts have been persistent to land our soldiers in the French trenches."  (55 Cong. Rec. p. 342.)

"Already we have loaned the allies, through our banking system, up to December 31, 1916, the enormous sum of $2,325,900,000 in formal loans.  Other huge sums have been loaned and millions have been added since that date.  'Where your treasures are, there will be your heart also.'  That is one of the reasons why we are about to enter this war.  No wonder the Morgans and the munition makers desire war.  .  .  .  Our financiers desire that Uncle Sam underwrite these and other huge loans and fight to defend their financial interests, that there may be no final loss."  (55 Cong. Rec. p. 362.)

"I believe that all Americans, except that limited although influential class which is willing to go on shedding other men's blood to protect its investments and add to its accursed profits, have abhorred the thought of war."  (55 Cong. Rec. p. 386).

"Likewise, Mr. Chairman, the J. Pierpont Morgans and their associates, who have floated war loans running into millions which they now want the United States to guarantee by entering the European war.  .  .  ."  (55 Cong. Rec. p. 372.)

"These war germs are both epidemic and contagious.  They are in the air; but somehow or other they multiply fastest in the fumes around the munition factories.  You will not find many in our climate.  ·

that these loans were not the slightest makeweight, much less a determining factor, in the country's decision, the fact that some of our representatives in the Senate and the House declared otherwise on one of the most solemn occasions in the history of the Nation, should help us to understand that statements like that here charged to be false are in essence matters of opinion and judgment, not matters of fact to be determined by a jury upon or without evidence; and that even the President's address, which set forth high moral grounds justifying our entry into the war, may not be accepted as establishing beyond a reasonable doubt that a statement ascribing a base motive was criminally false.  All the alleged false statements were an interpretation and discussion of public facts of public interest.  If the proceeding had been for libel, the defence of privilege might have been interposed. *Gandia* v. *Pettingill*, 222 U. S. 452.  There is no reason to believe that Congress, in prohibiting a special class of false statements, intended to interfere with what was obviously comment as distinguished from a statement.

The presiding judge ruled that expressions of opinion were not punishable as false statements under the act; but he left it to the jury to determine whether the five sentences in question were statements of facts or expressions of opinion.  As this determination was to be made from the reading of the leaflet unaffected by any extrinsic evidence the question was one for the court.  To hold that a jury may make punishable statements of conclusions or of opinion, like those here involved, by declaring them to be statements of facts and to be false would practically deny members of small political parties freedom of criticism and of discussion in times when feelings run high and the questions involved are deemed fundamental.

They also multiply pretty fast in Wall Street and other money centers. I am opposed to declaring war to save the speculators."  (55 Cong. Rec. p. 376.)

There is nothing in the act compelling or indeed justifying such a construction of it; and I cannot believe that Congress in passing, and the President in approving, it conceived that such a construction was possible.

*Second:* But, even if the passages from the leaflet set forth in the third count could be deemed false statements within the meaning of the act, the convictions thereon were unjustified because evidence was wholly lacking to prove any one of the other essential elements of the crime charged. Thus there was not a particle of evidence that the defendants knew that the statements were false. They were mere distributors of the leaflet. It had been prepared by a man of some prominence. It had been published by the national organization. Not one of the defendants was an officer even of the local organization. One of them, at least, was absent from the meetings at which the proposal to distribute the leaflet was discussed. There is no evidence that the truthfulness of the statements contained in the leaflet had ever been questioned before this indictment was found. The statement mainly relied upon to sustain the conviction—that concerning the effect of our large loans to the Allies—was merely a repetition of what had been declared with great solemnity and earnestness in the Senate and in the House while the Joint Resolution was under discussion. The fact that the President had set forth in his noble address worthy grounds for our entry into the war, was not evidence that these defendants knew to be false the charge that base motives had also been operative. The assertion that the great financial interests exercise a potent, subtle and sinister influence in the important decisions of our Government had often been made by men high in authority. Mr. Wilson, himself a historian, said before he was President and repeated in the New Freedom that: "The masters of the Government of the United States are the combined capitalists and manufacturers of the United

States." [1] We may be convinced that the decision to enter the great war was wholly free from such base influences but we may not, because such is our belief, permit a jury to find, in the absence of evidence, that it was proved beyond a reasonable doubt that these defendants *knew* that a statement in this leaflet to the contrary was false.

Nor was there a particle of evidence that these statements were made with intent to interfere with the operation or success of the military and naval forces. So far as there is any evidence bearing on the matter of intent, it is directly to the contrary. The fact that the local refused to distribute the pamphlet until Judge Rose had directed a verdict of acquittal in the Baltimore case shows that its members desired to do only that which the law permitted. The tenor of the leaflet itself shows that the intent of the writer and of the publishers was to advance the cause of Socialism; and each defendant testified that this was his only purpose in distributing the pamphlet. Furthermore, the nature of the words used and the circumstances under which they were used showed affirmatively that they did not "create a clear and present danger," that thereby the operations or success of our military and naval forces would be interfered with.

The gravamen of the third count is the charge of wilfully conveying in time of war false statements with the intent to interfere with the operation and success of our military or naval forces. One who did that would be called a traitor to his country. The defendants, humble members of the Socialist Party, performed as distributors of the leaflet what would ordinarily be deemed merely a menial service. To hold them guilty under the third

---

[1] Page 57. Then follows: "It is written over every intimate page of the records of Congress, it is written all through the history of conferences at the White House, that the suggestions of economic policy in this country have come from one source, not many sources."

count is to convict not them alone, but, in effect, their party, or at least its responsible leaders, of treason, as that word is commonly understood. I cannot believe that there is any basis in our law for such a condemnation on this record.

*Third:* To sustain a conviction on the second or on the sixth count it is necessary to prove that by coöperating to distribute the leaflet the defendants conspired or attempted wilfully to "cause insubordination, disloyalty, mutiny, or refusal of duty, in the military or naval forces." No evidence of intent so to do was introduced unless it be found in the leaflet itself. What has been said in respect to the third count as to the total lack of evidence of evil intent is equally applicable here.

A verdict should have been directed for the defendants on these counts also because the leaflet was not distributed under such circumstances, nor was it of such a nature, as to create a clear and present danger of causing either insubordination, disloyalty, mutiny or refusal of duty in the military or naval forces. The leaflet contains lurid and perhaps exaggerated pictures of the horrors of war. Its arguments as to the causes of this war may appear to us shallow and grossly unfair. The remedy proposed may seem to us worse than the evil which, it is argued, will be thereby removed. But the leaflet, far from counselling disobedience to law, points to the hopelessness of protest, under the existing system, pictures the irresistible power of the military arm of the Government, and indicates that acquiescence is a necessity. Insubordination, disloyalty, mutiny and refusal of duty in the military or naval forces are very serious crimes. It is not conceivable that any man of ordinary intelligence and normal judgment would be induced by anything in the leaflet to commit them and thereby risk the severe punishment prescribed for such offences. Certainly there was no clear and present danger that such would be the result.

The leaflet was not even distributed among those in the military or the naval service. It was distributed among civilians; and since the conviction on the first count has been abandoned here by the Government, we have no occasion to consider whether the leaflet might have discouraged voluntary enlistment or obedience to the provisions of the Selective Draft Act.

The fundamental right of free men to strive for better conditions through new legislation and new institutions will not be preserved, if efforts to secure it by argument to fellow citizens may be construed as criminal incitement to disobey the existing law—merely, because the argument presented seems to those exercising judicial power to be unfair in its portrayal of existing evils, mistaken in its assumptions, unsound in reasoning or intemperate in language. No objections more serious than these can, in my opinion, reasonably be made to the arguments presented in "The Price We Pay."