**UNITED STATES of America,**
**Appellee,**

v.

**Carl Eugene MUCHERINO, Appellant.**

**No. 8591.**

United States Court of Appeals
Fourth Circuit.

Argued Sept. 26, 1962.

Decided Dec. 7, 1962.

Michael A. Querques, Newark, N. J., for appellant.

Daniel W. Moylan and J. Hardin Marion, III, Asst. U. S. Attys. (Joseph D. Tydings, U. S. Atty., on brief), for appellee.

Before SOBELOFF, Chief Judge, BOREMAN, Circuit Judge, and JOHN PAUL, District Judge.

JOHN PAUL, District Judge.

This is a companion case to United States v. Wenzel, 4 Cir., 311 F.2d 164, in that the appellant here was convicted along with Wenzel in the District Court on an indictment charging them, along with others, with conspiracy to violate the laws relating to counterfeit money (18 U.S.C. §§ 472, 473). The indictment (Count 3) also charged appellant with the substantive offense of selling, exchanging, receiving and delivering the counterfeited notes. He was one of the three (out of eleven) conspirators who went to trial, and he was convicted on both the conspiracy count and on Count 3.

The appellant's first assignment of error is broken into two parts: (1) That the proof at the trial established the existence of numerous conspiracies and not the single conspiracy charged in the indictment; and (2) that the evidence at the trial failed to prove that appellant

was a party to the conspiracy charged in the first count.

Both of these matters have been dealt with in our opinion in the Wenzel case. We there set out the substance of the evidence by which the conspiracy was proved including that which showed the part played by this appellant. It is true that appellant sought to prove that he was not in Maryland on December 22, 1960, at which time, according to the Government's evidence, he had come to collect payment for the bogus money which he had supplied. But the evidence by which he sought to support his alibi was shown, in substantial part, to be fabricated; and evidently the jury believed no part of it.

In the Wenzel case we also discussed this contention as to multiple conspiracies and nothing needs to be added here, except to quote the following excerpt from the case of Lefco v. United States, (C.C.A.3) 74 F.2d 66, 68, which we cite as a statement of the settled law.

"There is nothing new in this defense of multiple conspiracies and nothing uncertain in the law arising from such a defense. Of course, to sustain a verdict on an indictment charging one particular conspiracy the evidence must establish the conspiracy charged. Evidence that establishes another conspiracy or several other conspiracies will not sustain the verdict. From this statement of law defendants, when in extremity, commonly resort to the contention that, not knowing all the conspirators or not knowing all the others were doing, they are responsible only for what they themselves were doing when caught, and as that usually is only a part of the conspiracy, they say, the part being less than the whole, it is different from the whole and in consequence is not the conspiracy alleged in the indictment and, for lack of proofs, they should be acquitted.

"Common design is the essence of conspiracy. The crime may be committed whether or not the parties comprehend its entire scope, whether they act separately or together, by the same or different means, known or unknown to some of them, but ever leading to the same unlawful result. Allen v. United States (C.C.A. [7]) 4 F.2d 688, 691; McDonnell v. United States (C.C.A. [1]) 19 F.2d 801; Capriola v. United States (C.C.A. [7]) 61 F.2d 5, 9; Williamson v. United States, 207 U.S. 425, 28 S.Ct. 163, 52 L. Ed. 278; Pierce v. United States, 252 U. S. 239, 243, 40 S.Ct. 205, 64 L.Ed. 542. All conspirators need not be acquainted with one another, nor need they have originally conceived or participated in the conception of the conspiracy. Those who come on later and cooperate in the common effort to obtain the unlawful results become parties thereto and assume responsibility for all done before. Van Riper v. United States (C.C.A. [2]) 13 F.2d 961; Coates v. United States (C.C.A. [9]) 59 F.2d 173. Nor does the mere fact that conspirators individually or in groups perform different tasks to a common end split up a conspiracy into several different conspiracies. United States v. McConnell (D.C.) 285 F. 164; Wilson v. United States (C.C.A. [2]) 190 F. 427."

Appellant's next complaint is that the Court limited the re-cross examination of the witness Morris (Sonny) Anglin, Jr.* Anglin was one of the conspirators who had pleaded guilty and testified for the Government. According to his testimony he, at the urging of Agresti, provided the means for satisfying the demands of Mucherino for payment for the counterfeits when the latter came to Maryland on December 22.

On cross-examination counsel for appellant asked this witness, who admitted to a number of felony convictions, if he had ever received psychiatric *treatment* in any hospital or while an inmate of any prison. When the witness replied in the negative he was asked if he had ever had a psychiatric *examination* while in prison. To this the witness replied that it

---

* There were two defendants named Anglin. Ernest Clifford Anglin stood trial and was acquitted. Morris (Sonny) Anglin pleaded guilty and was a Government witness.

was routine procedure in prisons to give everyone committed to such institutions a psychiatric examination within a day or two after his incarceration; and he stated that he had had several dozen of them. The examination of this witness went no further.

Some days later, after the Government had finished its case and the defense was being presented, counsel for the appellant offered to put in evidence a certified copy of an order entered in the United States District Court for the District of Columbia in April, 1951. A criminal proceeding was then pending in that Court against Anglin and the order recited that upon motion of his counsel it was ordered that Anglin be committed for examination and report as to his mental condition, such examination to be conducted either at Gallinger Hospital or at the Washington Asylum jail. In offering this document counsel stated that it was for the purpose of contradicting the statement of Anglin made when, in his testimony some days before, he was questioned about experiences with psychiatrists.

■ After careful consideration the Court declined to admit the paper in evidence. We are of opinion that this ruling was correct for several reasons. The avowed purpose in seeking to put the order in evidence was to discredit the credibility of Anglin as a witness. In the first place the order which directs an *examination* cannot be said to contradict the witness who readily admitted that he had been given psychiatric examinations many times—every time he had been imprisoned. What he denied was that he had ever undergone psychiatric *treatment*. The distinction is a real one. An examination is one step which has for its purpose the determination of whether a condition exists which calls for further steps in the form of treatment. The transcript of the testimony shows that Anglin himself recognized the distinction and marked it in his answers. He readily admitted the examinations but denied that they had ever resulted in treatment. There is nothing in the court

order of 1951 that contradicts this testimony.

The trial judge rejected the court record on the broader ground that the order "merely indicated that he was ordered to have a psychiatric examination prior ·to a conviction back in 1951", and that its admission would introduce into the case a collateral issue which would confuse the jury and which would necessitate allowing the Government to introduce testimony explaining the matter. The reason advanced by the Court for its action is, in our opinion, a sound one. Had the order been admitted in evidence the Government could not have been denied the right to open up the entire matter; to call for further records of the Court to ascertain whether the order had ever been carried out and, if so, to call for the hospital records to show the nature of any examination made or whether any treatment had been given. Hours and possibly a day or so would have been used in hearing testimony on this purely collateral matter, with the result of confusing the jury and diverting its attention from the real issues in the case.

■ As a further effort in the attempt to impair the force of Sonny Anglin's testimony counsel for appellant called as a witness Mr. Bracken, the U. S. Marshal, and stated that he proposed to show by the witness that on the day following that on which Anglin had testified he had, on being taken to jail, engaged in violent and erratic conduct, including protests at being locked up, breaking up furniture and threatening the Marshal and his staff with loss of their jobs. Counsel argued that this conduct indicated a mental instability which affected his credibility as a witness and should be shown to the jury for that purpose.

In sustaining an objection to the proffered testimony the Court gave as its reasons that the conduct in question occurred a day after the witness had testified, that there was no indication of what might have provoked it and that it again sought to introduce into the case a collateral and diversionary issue. We see no error in this action of the Court. To

have allowed this testimony would have opened up for investigation the entire episode, with testimony from both sides and with an unwarranted consumption of time and to the confusion of the jury.

The final complaint offered by appellant is to certain language used by Government Counsel in argument to the jury, and as to which appellant's counsel raised an objection. As to this the transcript shows the following:

Mr. Marion: "And Miss Serra, they finally came in with a patient. She was supposedly treated that day. Well, you heard she was the sister of Pat Serra, the political vassal up there who went with Dr. Mucherino to try to make a deal with the Marshal, who was down here in Court, but had nothing to testify to, and he went to Florida with Dr. Mucherino on some other business relationship. His sister. She says, I was treated by Dr. Mucherino—

Mr. Stanziale: "I have to interrupt at this point, I don't think it's fair to say Pat Serra was a political vassal—

The Court: "Continue with your argument and start closing it up, you are taking a little more time—"

The transcript discloses that this was all that was said on this subject by the District Attorney, counsel for the appellant or the Court. Counsel did not ask that the remarks be stricken or that any other action be taken by the Court, and there was no repetition. To come in now and urge this episode as reversible error appears to be grasping at the thinnest of straws.

Pat Serra to whom the prosecutor referred was a friend of Mucherino who, so it may be gathered from the evidence, had, or assumed to have political influence. And the evidence creates a strong inference, amounting almost to conclusive proof, that he sought to bring about a deal whereby Mucherino would give the Government authorities certain information in return for assurance that he would not be prosecuted. Incidentally

the Miss Serra (a sister of Pat Serra) who is mentioned had attempted to support Mucherino's alibi for December 22nd by testifying that she had been treated by him in his office in Newark on that day, whereas Mucherino, who is a chiropractor, had himself testified that the date fell on Thursday and that he had no office hours on that day.

A certain degree of latitude must be allowed counsel in argument, unless it be untruthful or plainly prejudicial. It may not have been entirely accurate to refer to Serra as a "vassal"; but we cannot see how Mucherino was prejudiced by this designation of his friend. The Court evidently considered this incident of so little moment as not to justify any comment or admonition. We agree and have commented here only because it is assigned as error.

The judgment is

Affirmed.