## GORIN v. UNITED STATES.

### SALICH v. SAME.

#### Nos. 9135, 9136.

Circuit Court of Appeals, Ninth Circuit.

April 22, 1940.

---

Isaac Pacht and Clore Warne, both of Los Angeles, Cal., and Donald R. Richberg, of Washington, D. C., for appellant Gorin.

Willard J. Stone, Jr., of Los Angeles, Cal., for appellant Salich.

Ben Harrison, U. S. Atty., and Harold Raymond Shire and Norman W. Neukom, Asst. U. S. Attys., all of Los Angeles, Cal., for appellee.

Before GARRECHT, HANEY and HEALY, Circuit Judges.

HANEY, Circuit Judge.

Appellants challenge judgments and sentences rendered against them after conviction on three counts of an indictment. The first count charged violation of § 1 of the Act of June 15, 1917, Ch. 30, 40 Stat. 217, 50 U.S.C.A. § 31; the second count charged violation of § 2 of that act, 50 U.S.C. A. § 32; and the third count charged violation of § 4 of that act, 50 U.S.C.A. § 34. Generally speaking, these offenses relate to espionage.

One branch of the Navy service is the Naval Intelligence Office. Headquarters for the Eleventh Naval District are at San Diego, the intelligence office there being in charge of a District Intelligence Officer. A branch office is located at San Pedro and is in charge of an Assistant District Intelligence Officer. The investigators employed at the San Pedro office make their reports orally or in writing. The Assistant District Intelligence Officer then digests and evaluates the information and dictates the report to the Chief Yeoman—a secretarial employee. The latter, in writing the report on the typewriter, makes an original, three yellow copies and one green copy. These reports are numbered consecutively. One yellow copy and one green copy are retained in the San Pedro office and the remaining copies are sent to the San Diego office.

Appellant Salich was born in Moscow, Russia, on May 24, 1905, and lived there until 1917, when he moved with his parents to Kazen, which is about 700 ·miles east of Moscow. He then went to Manchuria in 1920, to Yokohama, Japan, 1921, and to the United States in 1923. He became· a naturalized citizen of the United States, and was employed by the Berkeley Police Department as an active officer from July 1, 1930 until August 15, 1936. In 1935, Salich met one Aliavdin, Vice Consul for the Union of Soviet Socialist Republics (hereafter called the Soviet Union) in San Francisco, and thereafter saw him a number of times. In 1936, Salich made an application for a position with the United States Naval Intelligence Office. A letter from San Diego, dated August 10, 1936, advised Salich of his appointment, and he reported for work in San Pedro on August 19, 1936. At that time one Davis was District Intelligence Officer and one Roachefort was Assistant District Intelligence Officer. Salich thereafter saw Aliavdin in Los Angeles. Aliavdin knew that he was working for the Naval Intelligence Office.

Salich was an investigator and reported the results of his investigations to the As-

sistant District Intelligence Officer. He was expected to read the yellow copies of the reports which were kept in the Chief Yeoman's desk, in order to be familiar with the progress of investigations.

Appellant Gorin and his wife are citizens of the Soviet Union, and arrived in this country on January 10, 1936, under a passport issued by the Soviet Union. He then testified before a Board of Special Inquiry that he was to be employed in the Entourist Department of the Amtorg Trading Corporation, his salary to be paid by the Russian government through such corporation. His work was the organization of tourist parties from America to the Soviet Union. He was stationed at Los Angeles. Roachefort instructed Salich to contact someone in the Soviet Consulate regarding the activities of a Soviet official named Kaganovich in July or August 1937. Salich eventually contacted Gorin and had a conversation with him. Later during that year Gorin called at Salich's home, in the latter's absence, and told Salich's wife that he had a letter for Salich. A day or so afterward, Salich called at Gorin's home, ·found him busy, but saw him two or three days later, when he received the letter, written by Aliavdin introducing Gorin to Salich. At this meeting Gorin mentioned his interest in matters pertaining to Japanese activities and Japanese activities only. Salich told Gorin that he did not believe that he had any information which would be of benefit to anyone.

Salich reported the conversation to Roachefort. There was testimony that Roachefort ordered Salich to refrain from contacting Gorin. Salich testified that Roachefort told him to give Gorin such information as could be found in newspapers and periodicals, and try to obtain information from Gorin concerning the Japanese consulate. At any rate, after subsequent meetings and in March, 1938, Salich agreed to supply Gorin with certain information, on the theory that whatever information concerning the Japanese he gave to Gorin, it would benefit the United States as against the "common" enemy.

Davis was replaced as District Intelligence Officer on May 13, 1938 by one Zacharias. Roachefort was replaced as Assistant District Intelligence Officer on June 1, 1938.

Salich was in financial straits owing to marital difficulties and accepted a total of $1,700 from Gorin for the information supplied to Gorin. Salich testified that the money received by him was considered a loan. Salich gave to Gorin the substance of the information contained in some 43 reports as related in the yellow copies previously mentioned.

On September 30, 1938, a salesman for a dry cleaning establishment took a suit belonging to Gorin, and in a pocket of the suit the salesman found an envelope containing a sheet of paper and a $50 bill. The sheet of paper contained some typewriting and other writing. The salesman took the envelope to the Hollywood Police Station where a copy of the paper was made. The envelope and its contents were then given to Gorin's wife who had called at the cleaning establishment for it.

On December 10, 1938, several agents of the Federal Bureau of Investigation called at Salich's apartment and told him that they were making an investigation concerning information which he was supposed to have given Gorin. Salich agreed to, and did go to the office of the agents where he stated what he had done and identified the reports, the substance of which he had communicated to Gorin. The following day, Salich made a written statement containing some of the matters related above. Included in the statement was the following:

"Conscientiously and honestly I did not think that my actions, aside from being highly unethical, were inimical to the best interests of the United States, to which country I am extremely grateful for what it did for me and which country's citizenship I value * * *

"I sincerely state that at no time did I furnish Gorin any information which in my opinion would harm this country; on the contrary, I saw some reason to Gorin's argument that we had common cause, and by helping them I would also be indirectly helping our own cause * * *"

The reports mentioned above were not physically given to Gorin. Salich communicated the substance thereof to Gorin orally or in writing. The reports consisted principally of a relation of the movements of certain Japanese from one place to another, and activities thereof, such as photography, conferences and other matters. A few reports dealt with Japanese activities in Mexico, Mexican waters and Central America, and a few reports con-

cerned alleged communists and their activities. None of the reports contained any information regarding the army, the navy, any part thereof, their equipment, munitions, supplies or aircraft or anything pertaining thereto. One report named a number of Japanese "suspected" of being interested in intelligence work. Most of them, on their face, appear innocuous, there being no way to connect them with other material which the Naval Intelligence may have, so that the importance of the reports does not appear.

As illustrative of the information contained in the reports, we quote the report to Gorin made by Salich, found in Gorin's suit by the cleaning establishment's salesman:

"George Ohashi, of San Diego, is reported to have made a statement at a JACL meeting that he was not a fascist. Couple other members, Paul Nakadate and George Suzuki took esception to this remark and accused George Ohashi of being a communist and subsequently beat him up.

"Ohashi and his wife own a beauty shop in San Diego which was found burglarized one day and the place searched.

\* \* \* \* \* \*

"Dr. M. M. Nakadate is dentis and is brother of Paul Nakadate.

"Their father is Y. Nakadate who lives in San Diego and who is listed in our cards as 'radical—pro-Japanese'. Dr. N. M. Nakadate is borne in 1910; is member of United States Naval Reserve in dental corps and in 1935 did some training duty on board the USS Dorsey which is a destroyer. After completion of his sea duty he was attached to aviation unit of USNR, but because of his Japanese descent, it is evident, he is not being encouraged to continue his career with USNR.

"Bert Simmons a civilian employee on North Island, San Diego, which island houses Naval aviation. He was reported as a communist.

"The report, however, comes from a private watchman employed by Nick Harris Private Patrol. This watchman holds a dishonorable discharge from the Navy and it is believed that he made the report to ingratiate himself with the Navy. Report turned over to San Diego for further action."

One of the reports contained information regarding the activities of Japanese fishing boats, and of an acid said to have been deposited in salt water with which it reacted and caused a steel cable and a steel hull of a ship to be corroded through chemical action. This report was dated June 27, 1938. Practically everything which was contained in the report appeared in a printed periodical subsequently.[1] Other issues of the same periodical contained information of the same general nature as that contained in the reports.[2]

The indictment was filed on January 11, 1939. The first count thereof charged Salich, Gorin, and the latter's wife with copying, taking, making and obtaining documents, writings and notes of matters connected with the national defense, and describing the reports above mentioned. The second count charged defendants with communicating, delivering and transmitting to Gorin as a representative of the Soviet Union writings, notes, instruments and information relating to the national defense, and describing the same reports mentioned in the first count. The third count charged that the defendants conspired to communicate, deliver, transmit, and attempt to communicate, deliver and transmit to the Soviet Union and to a representative thereof, documents, writings, plans, notes, instruments and information relating to the national defense.

Each of the defendants demurred to the indictment, the demurrers all being overruled. Each of the defendants pleaded not guilty.

The trial court's instructions were comprehensive. As to the first count, the trial court instructed the jury that there were four elements to the crime therein charged: (1) the fact of taking or obtaining must be established; (2) there must be a purpose of obtaining information respecting the national defense; (3) there must be an intent or reason to believe that the information so obtained was to be used to the injury of the United States or to the advantage of the Soviet Union; (4) the information so taken must, in fact, relate to the national defense.

The detailed instructions regarding the first two of these elements added little. As to the third element, the court below in-

---

[1] Ken Magazine, July 27, 1939, p. 9.
[2] Ken Magazine, Vol. 1, No. 1, p. 40, April 7, 1938; Ken Magazine, April 6, 1939.

structed the jury that appellee must "prove either an intent or a reason to believe that the information was to be used either to the injury of the United States or to the advantage of" the Soviet Union; that the law would be satisfied if appellee proved "beyond a reasonable doubt that both Salich and Gorin had reason to believe that the information disclosed was to be used to the advantage of" the Soviet Union. The court also instructed the jury that they could consider the character of the information required, as to whether or not it was susceptible to use by the Soviet Union, and whether or not Salich knew facts from which he concluded, or reasonably should have concluded that the information could be used advantageously by the Soviet Union. The court below also charged the jury that if "there was no intent and no reason to believe on the part of either" Salich or Gorin, that "in so exchanging information that there would result an injury to the United States or advantage to" the Soviet Union, then the defendants must be acquitted.

As to the fourth element of the first count, the trial court instructed the jury that it was not required " * * * that the documents or information alleged to have been taken necessarily injure the United States or benefit any foreign nation. The document need not in fact be vitally important or actually injurious. The document or information must be, however, connected with or related to the national defense."

The court also instructed the jury as follows:

"You are instructed that the term 'national defense' includes all matters directly and reasonably connected with the defense of our nation against its enemies. The first lines of defense naturally are the men, the ships and guns of the navy, the men, the planes and the guns of the air corps and the men, forts and guns of the army. Behind these—but none the less necessary if the army and navy are to be kept in the field in wartime or well prepared in peacetime—are those places and things which are essential to the storage of reserves, the inter-communication of armed forces, the transportation of war supplies, the reconditioning of war-worn materials and men, and the manufacture of war supplies * * *

"You are instructed * * * that for purposes of prosecution under these statutes, the information, documents, plans, maps, etc., connected with these places or things [mentioned in the statute] must directly relate to the efficiency and effectiveness of the operation of said places or things as instruments for defending our nation * * *

"You are instructed that in the second place the information, documents or notes must relate to those angles or phases of the instrumentality, place or thing which relates to the defense of our nation * * *

"You are, then, to remember that the information, documents or notes, which are alleged to have been connected with the national defense, may relate or pertain to the usefulness, efficiency or availability of any of the above places, instrumentalities or things for the defense of the United States of America. The connection must not be a strained one nor an arbitrary one. The relationship must be reasonable and direct.

"Whether or not the information, obtained by any defendant in this case, concerned, regarded or was connected with the national defense is a question of fact solely for the determination of this jury * * *"

The detailed instructions under the first count also contained many examples to further explain the last element. The elements of the crime charged in the second count were stated by the court below: (1) the fact of disclosure must be proved; (2) the disclosure must be made to representatives or citizens of the Soviet Union; (3) the guilty intent or reason to believe that the information so obtained was to be used to the injury of the United States or to the advantage of the Soviet Union must be present; (4) the information so taken must, in fact, actually relate to the national defense. The detailed instructions as to each of these elements adds nothing to what has been related.

The court below instructed the jury to return a verdict that Gorin's wife was not guilty of the crimes charged in the first two counts. The jury acquitted Gorin's wife on the third count and convicted Gorin and Salich on all three counts, both of whom appealed from the judgment and sentence entered on the verdict.

The indictment is based on the Act of June 15, 1917, Ch. 30, 40 Stat. 217, 50 U.

718

S.C.A. § 31 et seq.[3] It was entitled "An act to punish acts of interference with the foreign relations, the neutrality, and the foreign commerce of the United States, to punish espionage, and better to enforce the criminal laws of the United States, and for other purposes" and was divided into thirteen titles. The first title consisted of nine sections and is headed with the word "Espionage". All three counts of the indictment are based on provisions in the first title of the act.

Section 1 of the act, on which the first count was based, provides in part: "That (a) whoever, for the purpose of obtaining information respecting the national defense with intent or reason to believe that the information to be obtained is to be used to the injury of the United States, or to the advantage of any foreign nation * * * (b) * * * copies, takes, makes, or obtains, or attempts, or induces or aids another to copy, take, make, or obtain, any sketch, photograph, photographic negative, blue print, plan, map, model, instrument, appliance, document, writing, or note of anything connected with the national defense * * * shall be punished by a fine of not more than $10,000, or by imprisonment for not more than two years or both."

Section 2 of the act, on which the second count was based, provides in part: "Whoever, with intent or reason to believe that it is to be used to the injury of the United States or to the advantage of a foreign nation, communicates, delivers, or transmits, or attempts to, or aids or induces another to, communicate, deliver, or transmit, to any foreign government * * * or to any representative, officer, agent, employee, subject, or citizen thereof, either directly or indirectly, any document, writing, code book, signal book, sketch, photograph, photographic negative, blue print, plan, map, model, note, instrument, appliance, or information relating to the national defense, shall be punished by imprisonment for not more than twenty years * * *."

Section 4 of the act, upon which the third count is based, provides as follows: "If two or more persons conspire to violate the provisions of sections two [32] or three [33] of this title, and one or more of such persons does any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be punished as in said sections provided in the case of the doing of the act the accomplishment of which is the object of such conspiracy. * * *"

Section 2 also provided for increased penalties for violation thereof in time of war. Section 3 provided a crime for commission of acts only in time of war.

#### Construction of the Act.

Appellants contend that the words "respecting the national defense" and "connected with the national defense" as used in § 1, and the words "relating to the national defense" as used in § 2, should be given a military and naval connotation, and that they should be limited in their application to the places and things specifically enumerated in § 1 of the act. To properly understand the contention it should be noted that § 1(a) of the act, which is not in question here, makes it a felony to obtain information "concerning any vessel, aircraft, work of defense, navy yard, naval station, submarine base, coaling station, fort, battery, torpedo station, dockyard, canal, railroad, arsenal, camp, factory, mine, telegraph, telephone, wireless, or signal station, building, office, or other place connected with the national defense, owned or constructed, or in progress of construction by the United States or under the control of the United States, or of any of its officers or agents, or within the exclusive jurisdiction of the United States, or any place in which any vessel, aircraft, arms, munitions, or other materials or instruments for use in time of war are being made, prepared, repaired, or stored * * *." The contention is, in effect, that the words just quoted define "national defense", so that when § 1(b) forbids the copying of a "document, writing, or note of anything connected with the national defense", it forbids such copying only if the document, writing, or note relates to or concerns a "vessel, aircraft, work of defense", etc., as enumerated in § 1(a).

To support the contention it is argued that §§ 1 and 2 are found in Title 50 of the United States Code entitled "War" and was therefore intended to apply only to persons who spy on the United States; that the rule of ejusdem generis, the legislative history, and grammatical incidents require such construction; and that any uncertain-

---

[3] See also: 34 U.S.C.A. § 1200, Article 4 "Fourth" and Article 5.

ty in the act must be construed in favor of appellants.

■■■ We think the contention is untenable. "The intention of the Congress is to be sought for primarily in the language used, and where this expresses an intention reasonably intelligible and plain it must be accepted without modification by resort to construction or conjecture". Thompson v. United States, 246 U.S. 547, 551, 38 S.Ct. 349, 351, 62 L.Ed. 876. See also: Helvering v. City Bank Farmers Trust Co., 296 U.S. 85, 89, 56 S.Ct. 70, 80 L.Ed. 62. It seems apparent beyond doubt, that § 1 of the act specifies five different and separate crimes. Each crime is defined in a subsection ending with a semi-colon and preceded by a designation consisting of a letter contained in parentheses. Each is as separate as it would be if made a separate section in the act. There is no room for the application of rules of construction. None of these subsections refers to another. Nowhere is an intent manifested that "national defense" was actually defined in § 1(a) or in any other subsection. In view of the plain meaning, we are not warranted in restricting the meaning of the words "national defense". Unquestionably, the words were used in a broad sense with a flexible meaning. That meaning accords with the rule that "unless Congress has definitely indicated an intention that the words should be construed otherwise, we must apply them according to their usual acceptation". Avery v. Commissioner, 292 U.S. 210, 214, 54 S.Ct. 674, 676, 78 L.Ed. 1216. We think there is here no definite indication that a restricted meaning was intended.

■■■ What is or is not "connected with the national defense" is a question of fact for the determination of the jury. Like many words, what is meant by the use thereof may change from time to time. For example, the operation of an automobile in a particular way twenty years ago might have been negligence then, but not negligent now in view of the changes which have occurred since. So, particular things which were once "connected with the national defense" may have lost such connection. For example, the plans for making a muzzle-loading flintlock might have been at one time "connected with the national defense" but it is difficult to understand how it would be today when they are no longer used.

As in most jury cases, a question of law is present, i. e., whether the jury would be justified in inferring from the evidence that the fact existed.

■■■ We are not in accord with what may be said to be a contrary view as expressed in the instructions, where it is indicated that the information must relate to the places mentioned in subsection (a) of § 1. However, since the instructions as given were favorable to appellants, they are in no position to allege error in that respect.

### Constitutionality of the Statute.

It is urged that under such construction, the statute is unconstitutional because it "would fix no immutable standard of guilt to govern conduct and would give no fixed and definite meaning * * * but would be subject to definition as to meaning by each court and jury". Violation of the Fifth and Sixth Amendments by the statute is urged. The Fifth Amendment prohibits deprivation of a person's life or liberty "without due process of law" and the Sixth Amendment provides that in all criminal prosecutions, the accused shall enjoy the right "to be informed of the nature and cause of the accusation".

Certain phases of the act have been considered, and the constitutionality thereof upheld. Schenck v. United States, 249 U. S. 47, 39 S.Ct. 247, 63 L.Ed. 470; Frohwerk v. United States, 249 U.S. 204, 39 S.Ct. 249, 63 L.Ed. 561; Abrams v. United States, 250 U.S. 616, 619, 40 S.Ct. 17, 63 L.Ed. 1173. It is not at all clear that the questions raised here are open to decision, in view of the broad language of O'Connell v. United States, 253 U.S. 142, 147, 148, 40 S.Ct. 444, 64 L.Ed. 827, and Milwaukee Social Democratic Pub. Co. v. Burleson, 255 U.S. 407, 409, 410, 41 S.Ct. 352, 65 L.Ed. 704. However, in view of the fact that different sections of the act were involved in those cases, we will assume that the questions have not been definitely decided by the Supreme Court.

■■■ The so-called general rule relied on here, is stated in Connally v. General Const. Co., 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322, as follows: "That the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penal-

ties is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law; and a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law. * * *"

As early as United States v. Brewer, 139 U.S. 278, 288, 11 S.Ct. 538, 541, 35 L.Ed. 190, it had been said that "Laws which create crime ought to be so explicit that all men subject to their penalties may know what acts it is their duty to avoid". These rules, however, are subject to the same mischief which they seek to control, and do not aid in the solution of the question urged here. That conclusion necessarily follows the fact that many criminal statutes must be and are construed notwithstanding there are doubts as to their meaning. The rulings in particular cases must be considered.

The following statutes have been held sufficiently definite:[4] denouncing contracts and arrangements "reasonably calculated" to fix and regulate the price of commodities, and prohibiting acts which "tend" to accomplish the prohibited results;[5] prohibiting certain things which "prejudice the public interests by unduly restricting competition or unduly obstructing the course of trade";[6] requiring a proprietor or keeper of hotel, in case of fire, to "do all in their power" to save guests;[7] prohibiting sheep owner from permitting sheep to graze on any cattle range previously occupied by cattle, or upon any range "usually" occupied by any cattle grower as range for his cattle;[8] prohibiting sales of meat falsely represented as "kosher" or as having been prepared of a product "sanctioned by the orthodox Hebrew religious requirements";[9] requiring the quantity of the contents of a package to be marked on the outside thereof, provided that "reasonable variations shall be permitted, and tolerances and also exemptions as to small packages shall be established by rules and regulations";[10] and authorizing a state officer to "mutualize or reinsure the business of" an insurance company "or enter into rehabilitation agreements".[11]

On the other hand, the following statutes have been held too vague and indefinite: prohibiting the enhancement by combinations of the cost of any article above its "real value" which was construed to mean "market value under fair competition, and under normal market conditions";[12] providing that it was unlawful for any person willfully to make any "unjust or unreasonable rate or charge" in handling or dealing in or with any necessaries;[13] requiring payment to state employees of the "current rate" of per diem wages in the "locality" where the work is performed;[14] providing that it was not unlawful to market products at a "reasonable profit" by agreement or association, which could not otherwise be so marketed;[15] and declaring that a person not engaged in any lawful occupation, "known" to be a member of any "gang" who had been convicted of a crime was a "gangster".[16]

 In logic, the statute here involved could be said to be analogous to some of the cases involved in the first group, and to be analogous to some of those involved in the second group. No workable statement of differentiation is apparent from these decisions. Apparently the ques-

[4] See also: Fox v. Washington, 236 U. S. 273, 277, 35 S.Ct. 383, 59 L.Ed. 573; Whitney v. California, 274 U.S. 357, 47 S.Ct. 641, 71 L.Ed. 1095.

[5] Waters-Pierce Oil Co. v. Texas (No. 1), 212 U.S. 86, 109, 29 S.Ct. 220, 53 L.Ed. 417.

[6] Nash v. United States, 229 U.S. 373, 376, 33 S.Ct. 780, 781, 57 L.Ed. 1232.

[7] Miller v. Strahl, 239 U.S. 426, 431, 36 S.Ct. 147, 149, 60 L.Ed. 364.

[8] Omaechevarria v. Idaho, 246 U.S. 343, 38 S.Ct. 323, 62 L.Ed. 763.

[9] Hygrade Provision Co. v. Sherman, 266 U.S. 497, 501, 45 S.Ct. 141, 69 L.Ed. 402.

[10] United States v. Shreveport Grain & El. Co., 287 U.S. 77, 53 S.Ct. 42, 43, 77 L.Ed. 175.

[11] Neblett v. Carpenter, 305 U.S. 297, 303, 59 S.Ct. 170, 173, 83 L.Ed. 182.

[12] International Harvester Co. v. Kentucky, 234 U.S. 216, 34 S.Ct. 853, 855, 58 L.Ed. 1284; Collins v. Kentucky, 234 U.S. 634, 638, 34 S.Ct. 924, 58 L.Ed. 1510.

[13] United States v. Cohen Grocery Co., 255 U.S. 81, 41 S.Ct. 298, 299, 65 L.Ed. 516, 14 A.L.R. 1045.

[14] Connally v. General Const. Co., 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322.

[15] Cline v. Frink Dairy Co., 274 U.S. 445, 456, 47 S.Ct. 681, 71 L.Ed. 1146.

[16] Lanzetta v. New Jersey, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888.

tion has been decided in the above mentioned cases on the basis of appeal of the contention to the court in each individual case rather than by measurement with a definite rule. Because of the doubt as to the controlling group of cases, we assume that the rebuttable presumption of constitutionality[17] has disappeared.[18] However, the result is controlled by the rule that "It is incumbent * * * upon those who affirm the unconstitutionality of an act of Congress to show clearly that it is in violation of the provisions of the Constitution. It is not sufficient for them that they succeed in raising a doubt". Legal Tender Cases, 79 U.S. 457, 12 Wall. 457, 531, 20 L.Ed. 287. We hold that appellants have failed to carry the burden of proving unconstitutionality of the statutes involved. We add that the words of the statutes "national defense" are similar to the words "common defence" as used in § 8, Article I of the Constitution.

### The Evidence.

■ Appellants contend that the court erred in failing to direct a verdict in their favor, because of insufficiency of evidence. The applicable rule is that if there is substantial evidence to support the charges, then a peremptory instruction of acquittal should not be made, but it is a question for the jury to determine whether "the effect of the evidence was such as to overcome any reasonable doubt of guilt". Pierce v. United States, 252 U.S. 239, 251, 252, 40 S.Ct. 205, 210, 64 L.Ed. 542. Likewise, the effect and weight of the fair inferences to be drawn from the evidence for appellee is for the jury. Gunning v. Cooley, 281 U.S. 90, 94, 50 S.Ct. 231, 74 L.Ed. 720.

■ It is urged that the Naval Intelligence reports show on their face that they do not relate to the national defense. We think the contention cannot be sustained. It is unnecessary to state what inferences were properly deducible from all the reports. It is sufficient to consider one which is favorable to appellee. One of the reports named a number of Japanese "suspected" of being interested in intelligence work. The jury could properly infer, we think, that it is highly important to the Navy to know possible spy suspects, and that it is vital that the foreign government be ignorant of the Navy's knowledge, because if such government was aware of the Navy's knowledge, it would, conceivably, replace such agents with others, or direct them to cease their activities and employ others. It is likewise inferable that if the agents were aware of the Navy's knowledge they would take steps to hide any activity which might lead to their arrest and eradication. It is obvious that the detection of spies is important in the event of war, as shown by the extreme penalty meted out for such offense. We think the jury could properly conclude from these inferences that the report "related" to the national defense.

■ It is also urged that intent consists of two elements, i e., will and knowledge, and that while there was evidence of will, there was no evidence that appellants knew these reports "related" to the national defense, or that their acts were unlawful. Whatever refinement in the definition of intent can be made, it is clearly not controlling here. The statute does not require unconditionally an intent, for in the words of the statute "reason to believe" is said to be sufficient. The trial court properly so instructed. Considering the source of the information divulged, and the desire of Gorin to obtain it, we think the jury could properly infer that appellants had reason to believe that such information was "to be used to the injury of the United States, or to the advantage of" a foreign nation.

■ Error in the admission of the testimony of Commander Zacharias is also alleged. Zacharias was District Intelligence Officer, and a superior of Salich. His testimony was to the effect that he had specifically instructed Salich not to divulge any information. The court carefully instructed the jury that whatever Zacharias said was not to be taken as any statement of law, and that they should consider only the law communicated to them by the trial court. As so limited we see no error in the admission of the evidence. The proof was pertinent because it had a bearing on Salich's "reason to believe".

17 Borden's Farm Products Co. v. Baldwin, 293 U.S. 194, 209, 55 S.Ct. 187, 79 L.Ed. 281.

18 Del Vecchio v. Bowers, 296 U.S. 280, 56 S.Ct. 190, 80 L.Ed. 221; New York Life Ins. Co. v. Gamer, 303 U.S. 161, 170, 171, 58 S.Ct. 500, 82 L.Ed. 726, 114 A.L.R. 1218; Department of Water and Power v. Anderson, 9 Cir., 95 F.2d 577, 583.

 It is also asserted that the exclusion of the Ken Magazine article was error. It is said that such article discloses that the information conveyed to Gorin was well known to the public and not confidential matters. While a serious question might arise in a case where the only information divulged was such as could be found in newspapers or periodicals available to the public, such question does not arise in this case, because the article in the periodical does not, and does not purport to relate all information contained in the reports in question. Assuming, without so deciding, that it was error to exclude the article insofar as it had a bearing on the same information contained in some of the reports, the record affirmatively discloses that the error was not prejudicial because the information in the other reports is not contained in the article. See Lynch v. Oregon Lumber Co., 9 Cir., 108 F.2d 283, 285–286.

We are, of course, conscious of the argument which could be made that the information divulged must not be of any importance or the Naval Intelligence Office would not have made the information available to the public by presenting the reports in evidence. Such procedure was a necessity in order to try the case. Whether it is sound, we think, is a question for the determination of Congress.

### The Instructions.

 The court's instruction as to the "national defense" is challenged, but we find no error therein except as stated above. It is urged that the instruction left it to the jury to speculate whether the information related to the national defense. As previously stated, we think the question is one of fact, and the decision thereof by the jury gives rise to no more or different speculation than the decision by a jury of any other fact question.

 Finally, it is contended that the court erred in failing to give a requested instruction to the effect that if the jury acquitted Gorin's wife of the conspiracy charge, they must also acquit appellants, because if appellants conspired to convey the information to a representative of a foreign government, then there was no proof of anyone receiving the information from the transmitters.[19] The judgment and sentence of the court makes it unnecessary to consider this contention. Gorin received a sentence of six years on the third count and six years on the second count, the terms to run concurrently. Salich received a sentence of four years on the third count and four years on the second count, the terms to run concurrently. It is therefore immaterial whether the judgments and sentences on the third count were right or wrong. Brooks v. United States, 267 U.S. 432, 441, 45 S.Ct. 345, 69 L.Ed. 699, 37 A.L.R. 1407.

Affirmed.

---

[19] Appellants rely on: United States v. Katz, 271 U.S. 354, 46 S.Ct. 513, 70 L.Ed. 986; United States v. Dietrich, C.C.Neb., 126 F. 664; United States v. New York, etc., R. R. Co., C.C.N.Y., 146 F. 298.