**UNITED STATES of America**

**v.**

**Kevin Patrick MALLORY, Defendant.**

**Case No. 1:17–cr–154**

United States District Court,
E.D. Virginia,
Alexandria Division.

Signed 07/07/2017

John T. Gibbs, US Attorney's Office, Alexandria, VA, for Plaintiff.

Geremy C. Kamens, Todd M. Richman, Office of Federal Public Defender, Alexandria, VA, for Defendant.

## ORDER

T. S. Ellis, III, United States District Judge

This prosecution for espionage came before the Court on the government's motion to revoke defendant's bond pending trial pursuant to 18 U.S.C. §§ 3142 and 3145.[1]

1. Defendant is accused by criminal complaint   of having willfully passed classified national

At issue is whether there is any condition or combination of conditions (i) that can reasonably assure the defendant's appearance at trial, and (ii) that can reasonably assure the safety of the community.

## I.

### A.

The facts recited below are derived from the criminal complaint; the pretrial services report; the affidavit and testimony of Special Agent Stephen Green of the Federal Bureau of Investigation ("FBI"); the declaration of Information Review Officer Antoinette B. Shiner ("Officer Shiner") of the Central Intelligence Agency ("CIA"); the seven exhibits admitted at the hearings that took place on July 6 and 7, 2017, including a memorandum from the Deputy Director of the Defense Intelligence Agency ("DIA"); and the proffers of defense counsel.

The record establishes the following facts relating to defendant's personal history and characteristics.

- Defendant is a 60 year old male.
- He is a United States citizen.
- Defendant is married to a naturalized United States Citizen of Taiwa-

nese descent and has six children, three of whom are the products of a previous marriage and one of whom is a minor residing in the family home.[2]

- Defendant has three living siblings and one half-sibling, all of whom reside in the United States. His parents are deceased.
- Defendant holds a Bachelor's degree in political science from Brigham Young University.
- Defendant is fluent in Mandarin Chinese.
- Defendant was an active duty military officer from 1981 to 1986.
- He was an Army reservist from 1986 to 2013.[3]
- Defendant was a Special Agent for the State Department Diplomatic Security Service from 1987 to 1990.
- Between 1990 and 1996, defendant was employed as a covert agent and case officer at the CIA.[4]
- Defendant was also employed by the DIA for an unidentified period of time.
- Defendant again worked for the CIA as a contractor from 2010 to 2012.[5]

defense information to intelligence officers of the People's Republic of China ("PRC") in violation of 18 U.S.C. § 794. Defendant is also accused of making materially false statements to the Federal Bureau of Investigation in violation of 18 U.S.C. § 1001.

**2.** Two of defendant's children still reside in the family home and are 18 and 15, respectively. Defendant's 20-year-old son attends college in Utah and his 18-year-old son will soon attend college in Idaho.

**3.** Defendant has served several active duty deployments where he was stationed in Iraq, the PRC and Taiwan. During much of this time, defendant held a top secret security clearance and was privy to sensitive national security and defense secrets.

**4.** Officer Shiner declared that defendant's primary role as a covert case officer was to recruit clandestine human intelligence sources.

**5.** According to Officer Shiner, defendant during his entire tenure at the CIA had access to "sensitive, classified, national defense-related information, to include the identities of covert CIA officers, the identities of clandestine human sources, details of sensitive intelligence collection operations, details of sensitive intelligence collection methods, details of CIA clandestine training, and details of clandestine tradecraft the Agency employs to avoid detection by hostile foreign intelligence services." Doc. 25–1 ¶ 4.

- Defendant maintained a top secret security clearance throughout the majority of his career in government service, but his security clearance was terminated in 2012 after he left the CIA.

- Since 2013, defendant has operated his own consulting business, Global Ex.

- Defendant and his wife own a home in Loudoun County, Virginia; two vehicles, including a 1996 Toyota Avalon and 2000 Toyota LX 470; and have approximately $2,500 in cash and other investments.

- Defendant's home is currently under water, as the home is currently valued at $754,920 but defendant owes $850,000 on the mortgage. In addition, defendant is approximately five months in arrears on his home mortgage.

- Defendant has $50,000 in credit card debt.

- Defendant has at least one foreign bank account located in Hong Kong with a balance of at least $6,000.[6]

- Defendant has earned little to no income in the past two years and his wife is a school bus driver and earns approximately $9,000 per year.

The following factual allegations relate to defendant's purported commission of the crime of espionage:

6. The government rightly noted at oral argument that it is, at best, odd and, at worst, suspicious, that defendant maintains a foreign bank account when his financial situation here in the United States has completely deteriorated.

7. Defendant contends he believed PRC2 was a recruiter for the Shanghai Academy of Social Sciences.

- In February 2017, an alleged Chinese intelligence officer, who is identified in the criminal complaint as "PRO," purportedly contacted defendant on a social media website.[7]

- After this initial contact, defendant had several telephonic interviews or discussions with PRC2 and was ultimately introduced to PRC1, an employee of the Shanghai Academy of Social Sciences and an alleged intelligence agent for the People's Republic of China ("PRC" or "China").[8]

- PRC2 set up a meeting in China between defendant, PRC1 and PRC3, PRC1's boss.

- Defendant claims that before travelling to China he contacted two former co-workers at the CIA and requested that they facilitate a meeting with CIA officials.

- Defendant did not meet with any CIA official before travelling to China.

- On two occasions in March and April 2017, defendant flew to Shanghai, China and met with PRC1 and PRC2.

- Defendant claims that PRC1 and PRC2 wanted him to consult for the Shanghai Academy of Social Sciences and that while he was in China defendant drafted two "white papers" using publicly available information.

8. Special Agent Green states that while the Shanghai Academy of Social Sciences conducts legitimate academic operations, its employees have also been known to work for the Shanghai State Security Bureau, which in turn is a sub-component of the Ministry of State Security which is the PRC's equivalent of the CIA. According to the FBI, the Ministry of State Security often uses employees of the Shanghai Academy of Social Sciences to serve as "spotters and assessors." Doc. 2 ¶ 14.

- Defendant claims he was paid $25,000 for his consulting services.

- Defendant reentered the United States on April 21, 2017, following a flight from Shanghai to Chicago. When asked on U.S. Customs and Border Patrol ("CBP") form 6059b whether he possessed more than $10,000 in U.S. currency, the defendant marked "no." After being stopped, interviewed and searched by CBP, however, defendant admitted to carrying $16,500 in cash.

- After this incident, defendant arranged several meetings with U.S. law enforcement agencies.

The following facts arise from events that occurred after defendant's return to the United States from China, including his meeting with FBI agents, his arrest and the search of his home:

- After returning from China, defendant again contacted a former co-worker at the CIA.

- This former co-worker scheduled a meeting with a CIA official on May 12, 2017.

- At the May 12, 2017 meeting, defendant told the CIA official that he had met with three individuals in Shanghai, China that he believed were Chinese intelligence officers. Defendant also stated that PRC1 had given him a cellphone and had trained him how to use it. Defendant did not have the cellphone with him during that May 12 meeting.

- Following the May 12 meeting, defendant agreed to another meeting and also agreed to allow agents of the U.S. government to inspect his phone.

- Defendant appeared at a meeting on May 24, 2017, expecting to meet with the same CIA official he had met

with on May 12. When he arrived at the meeting, however, he was introduced to several FBI agents.

- At the May 24 meeting, defendant again expressed his belief that he had met with three Chinese intelligence officers. He told FBI agents that PRC1 and PRC3 had encouraged defendant to obtain employment with a United States government agency to obtain information.

- Defendant also confirmed that PRC1 had given him a cellphone and consented to FBI agents searching the device. In fact, defendant offered to show the FBI agents how the device transitioned from normal message mode to secure message mode.

- When doing this, however, defendant appeared surprised when he saw that some of the secure messages between defendant and PRC1 were still present on the device.

- Upon searching the device given to defendant by PRC1, FBI agents found four documents and a table of contents listing eight documents.

- A forensic analysis of the phone revealed that defendant had transmitted at least two of the documents to PRC1.

- Of the four documents found on the phone, three were CIA documents, one of which was classified as TOP SECRET at the time it was transmitted to PRC1 and the other two were classified as SECRET.

- In addition to uncovering several classified documents, FBI agents also recovered several text messages between defendant and PRC1.

  ○ In a message sent on May 1, 2017, defendant stated, "Also, we may need to go again step by step in my getting the document to become

part of the image. Then sending it to you." Doc. 2 ¶ 34.

○ In a message sent on May 3, 2017, PRC1 and defendant discussed two documents "no 1 and no 2" which defendant had sent to PRC 1. *Id.* ¶ 36.

○ During a May 3, 2017 communication with defendant, PRC1 wrote "I suggest you send all and retype the handwriting. And no 1 is obvious the first page of a complete article, where the else is and why it is black on top and bottom ... we will try our best to apply for another sum of amount, as you required. However, I'm not sure it will be the same amount for now and I will try, and for safety, we cannot send u in one time or in a short period altogether, need to figure out a better way." *Id.* ¶ 37.

○ In a message sent on or about May 3, 2017, defendant responded, "The black was to cross out the security classification (TOP SECRET//ORCON//... I had to get it out without the chance of discovery. Unless read in detail, it appeared like a simple note ... I have arranged for a USD account in another name. You can send the funds broken into 4 equal payments over 4 consecutive days ... when you agree I will send you the bank e.g. instructions.... It was dicey (look it up) when they asked for me by name. If they we looking for me in terms of State Secrets, and found the SD card ..., we would not be talking today. I am taking the real risk as you, [PRC3], and higher up bosses know.... When you get the

OK to replace prior payment, then I will send more docs. I will also type my notes. NOTE: In the future, I will destroy all electronic records after you confirm receipt... I already destroyed the paper records. I cannot keep these around, too dangerous." *Id.* ¶¶ 38–39.

○ In a message dated May 5, 2017, defendant wrote to PRC1: "your object is to gain information, and my object is to be paid for [it]." PRC1 responded, "My current object is to make sure your security and try to reimburse you." *Id.* ¶ 40.

○ In another message sent on or about May 5, 2017, defendant wrote: "I can also come in the middle of June. I can bring the remainder of the documents I have at that time." *Id.* ¶ 41.

● The FBI subsequently arrested defendant and searched his home.

● During that search, FBI agents found in defendant's home: (i) a Toshiba SD card that was crumpled up in a piece of tin foil; (ii) a packet of wigs, fake mustaches, adhesives, makeup, and a liquid that can give skin the appearance of scarring; (iii) evidence of defendant's foreign HSBC account in Hong Kong; and (iv) handwritten notes containing information about some of the CIA's sensitive human sources of intelligence.

● The Toshiba SD card contained seven classified documents.[9]

● After analyzing the documents found on defendant's phone and the Toshiba SD card, CIA Officer Shiner confirmed that:

---

9. Of the seven classified documents contained on the Toshiba SD card, two were and continue to be classified as TOP SECRET, and 5 were and continue to be classified as SECRET.

[T]he CIA documents found in the defendant's possession, some of which are alleged to have been transmitted to a foreign intelligence service, contain information that remains currently and properly classified pursuant to Executive Order .... [T]his information is properly classified at the SECRET and TOP SECRET levels.[10] Doc. 25–1 ¶ 5.

- Officer Shiner further declared:

The CIA information contained in the documents at issue reveals a broad range of sensitive national security related information, to include sensitive intelligence collected by the CIA, the CIA's analysis of the intelligence it collected and in some instances, the actual sources of the intelligence, which range from human sources to technical collection.... [S]ome of the national security related information in the documents at issue provides granular details on how a specific form of intelligence collection can be used to support clandestine operations. Other national security information in the documents at issue (one of the documents that was alleged to have been passed by the defendant to a foreign intelligence officer) reveals the breadth and depth of the Agency's intelligence collection on a specific hostile foreign intelligence service, to include specific details as to how that hostile foreign intelligence service approaches counterintelligence operations. ... The unauthorized disclosure

of the information at issue could reasonably be expected to cause the loss of critical intelligence and possibly result in the lengthy incarceration or *death of clandestine human sources*. *Id.* ¶¶ 6–7 (emphasis added).

- Following defendant's arrest and the search of his home, defendant placed a telephone call from the Alexandria Detention Center and surreptitiously asked his wife and son to search for the Toshiba SD card and determine whether the FBI had found that SD card during the search.

**B.**

On June 22, 2017, defendant appeared before United States Magistrate Judge Theresa Buchanan for his initial appearance. Judge Buchanan set a preliminary and detention hearing for June 23, 2017, and signed a temporary detention order. Thereafter, the parties jointly sought a continuance and the preliminary and detention hearing was reset before Magistrate Judge Ivan Davis. After reviewing the criminal complaint, hearing the testimony of Special Agent Green of the FBI, and considering the proffers of defense counsel, Judge Davis granted defendant a $10,000 unsecured bond and imposed the following conditions of release: [11]

- Defendant and his immediate family members must surrender their passports;

10. In her declaration, Officer Shiner confirms that any documents marked SECRET means that the CIA has determined unauthorized disclosure of that document would cause "serious damage" to the national security of the United States. Moreover, the CIA expects that the unauthorized disclosure of any document marked TOP SECRET would cause "exceptionally grave damage" to the national security of the United States. Doc. 25–1 ¶ 2.

11. It must be noted that Magistrate Judge Davis had a threadbare record before him. Indeed, the government presented significantly more evidence during the bond revocation hearings. For example, only on the second of two bond revocation hearings did the government reveal that defendant was a former CIA and DIA operative.

- Defendant cannot leave the Washington D.C. metropolitan area without prior approval of Pretrial Services of the Court;

- Defendant cannot possess a firearm or other weapon;

- Defendant shall be restricted to his residence at all times except for employment, education, religious services, medical treatment, attorney visits, court-ordered obligations and appearances or other activities pre-approved by Pretrial Service;

- Defendant shall be released into the custody of his wife who shall serve as a third-party custodian;

- Defendant shall not have access to any computer or gaming device with internet capabilities unless a computer monitoring program has been installed on the device; and

- No contact with foreign individuals without prior approval of the Court or pretrial services.

■ The government moved for review of the Magistrate Judge's order pursuant to 18 U.S.C. § 3145(a)(1), contending that defendant's bond should be revoked.[12] Review pursuant to § 3145(a) is conducted *de novo. United States v. Clark*, 865 F.2d 1433, 1436 (4th Cir. 1989).

**12.** Section 3145 provides in pertinent part:

If a person is ordered released by a magistrate judge ... the attorney for the Government may file, with the court having original jurisdiction over the offense, a motion for revocation of the order or amendment of the conditions of release ....
18 U.S.C. § 3145(a)(1).

**13.** While both parties initially asserted that § 3142(e)(2)'s presumption of detention applied in this case, they now agree, at the Court's suggestion, that it does not.

## II.

Criminal defendants are generally entitled to pretrial release under the Bail Reform Act. The government, however, may move for detention pending trial in cases involving, *inter alia*, "an offense for which the maximum sentence is life imprisonment or death ...." 18 U.S.C. § 3142(f)(1). Here, defendant is charged with espionage, which carries a maximum sentence of lifetime imprisonment and, under certain circumstances, may carry a penalty of death. *See* 18 U.S.C. § 794.

Thus, pursuant to § 3142(e)(1), defendant must be detained pending trial if the government proves that there is "no condition or combination of conditions" that "will reasonably assure" both (i) "the appearance of [defendant] as required," and (ii) "the safety of any other person and the community[.]"[13] 18 U.S.C. § 3142(e)(1). The government bears different burdens of persuasion on each of these categories. Notably, the government is only to required show by a preponderance of evidence that the defendant poses a risk of flight and that no conditions of release can reasonably assure his appearance at trial;[14] whereas the government must prove by clear and convincing evidence that the defendant poses a danger to the community and that no conditions can reasonably assure the safety of other individuals and the community.[15]

**14.** *See, e.g., United States v. Stewart*, 19 Fed. Appx. 46, 48 (4th Cir. 2001) ("With regard to the risk of flight as a basis for detention, the government must prove by a preponderance of the evidence that no combination of conditions will reasonably assure the defendant's presence at future court proceedings." (citing *United States v. Hazime*, 762 F.2d 34, 37 (6th Cir. 1985); *United States v. Medina*, 775 F.2d 1398, 1402 (11th Cir. 1985)).

**15.** 18 U.S.C. § 3142(f)(2)(B) ("The facts the judicial officer uses to support a finding ... that no condition or combination of conditions will reasonably assure the safety of any

If the government fails to meet its burden on both prongs, risk of flight and danger to the community, defendant must be released pursuant "to the least restrictive [ ] condition, or combination of conditions, that ... will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(c)(1)(B).[16]

In determining whether defendant poses an unreasonable risk of flight or danger to another person, the following factors must be considered:

(1) the nature and circumstances of the offense charged ...;

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person ...; [and]

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. ...

*Id.* § 3142(g).

These factors, as applied below, point convincingly to the conclusion that no set of conditions can reasonably assure defendant's appearance at trial or the safety of any other person and the community. Put differently, the government has met its burdens of persuasion to demonstrate that defendant poses an unreasonable risk of flight and a danger to the community, and that there are no conditions of release that can adequately mitigate these risks.

### III.

#### A.

With respect to the risk of flight, the government has shown by a preponderance of the evidence that defendant is a flight risk. The findings of fact and each statutory factor require that defendant be detained pretrial.

#### 1.

■ To begin with, the nature and circumstances of this offense—a prosecution for espionage under 18 U.S.C. § 794—support the conclusion that defendant is a significant flight risk. A conviction pursuant to § 794 carries a maximum penalty of life in prison and, if certain conditions are met, death. In this case, the declaration of CIA Officer Shiner reflects that defendant likely transmitted or attempted to transmit (i) information that could result in the identification by a foreign power of a clandestine human source and could potentially result in harm or death to that source and (ii) information relating to national defense and relating directly to communications intelligence, either of which qualifies defendant for the death penalty under the statute. Thus, if defendant is convicted of the crimes charged, and given his current age, his likely sentence would be either nominally or practically a life term of imprisonment.[17] Given this, the risk that defendant will flee is high.

#### 2.

■ The second § 3142 factor is the weight of the evidence against defendant.

---

other person and the community shall be supported by clear and convincing evidence.").

16. Section 3142(c)(1)(B) contains a non-exhaustive list of 14 conditions judicial officers should consider in fashioning appropriate conditions of release. *See* 18 U.S.C. §§ 3142(c)(1)(B)(i)-(xiv). Each condition has been considered in the instant case.

17. The government proffered that the low-end of defendant's sentencing guidelines range would be 360 months. Therefore, if defendant received a low-end guideline sentence, he would be 90 before he would be set for release.

To prove defendant committed espionage, and more specifically that defendant gathered or delivered defense information to aid a foreign government in violation of 18 U.S.C. § 794, the government must convince the trier of fact beyond a reasonable doubt that: (i) defendant communicated, delivered, or transmitted a document, writing, plan, note, sketch, photograph, blueprint, map, model or information (collectively, "information") to a foreign government or representative, officer, agent, subject, or citizen of a foreign government; (ii) that such information related to the national defense of the United States (national defense information or "NDI"); [18] (iii) that defendant acted with intent or reason to believe that such information was to be used to the injury of the United States or to the advantage of a foreign nation; [19] and (iv) that defendant acted willfully. *See* 18 U.S.C. § 794(a); *Gorin v. United States*, 111 F.2d 712, 716 (9th Cir. 1940), *aff'd* 312 U.S. 19, 61 S.Ct. 429, 85 L.Ed. 488 (1941).

Here, the government has provided ample evidence showing that defendant delivered defense information to aid a foreign government. Specifically, the government produced evidence that defendant travelled to China twice in March and April 2017 and met with Chinese intelligence operatives. Defendant, by his own admissions to law enforcement, confirmed as much; defendant himself believed that PRC1, PRC2, and PRC3 were Chinese intelligence agents. Moreover, FBI agents uncovered evidence that defendant stored classified NDI on (i) a cellphone that PRC1 provided defendant and (ii) on a Toshiba SD card that defendant kept wrapped in tin foil in his closet. Subsequent forensic analysis tentatively confirms that defendant transmitted at least two of these classified documents to PRC1.

Indeed, the government has demonstrated that defendant had at least eight documents in his possession, some of which were classified as "Top Secret" and others were classified as "Secret, No Foreign, ORCON," meaning that only the originating agency is authorized to allow dissemination. Those specific classifications mean that the CIA and DIA concluded that the information in these documents, if disclosed, posed, at best, a serious danger, and, at worst, an exceptionally grave danger to the United States. The CIA has also confirmed that some of the information in defendant's possession included "granular details on how a specific form of intelligence collection can be used to support clandestine operations." Doc. 25–1. Addi-

**18.** The definition of NDI was discussed in *United States v. Rosen*, 599 F.Supp.2d 690 (E.D. Va. 2009). Specifically, NDI is "that information, which, as of the time of the alleged disclosure, is found by a jury beyond a reasonable doubt (i) to have been closely held by the government and (ii) to be potentially damaging to the United States or useful to an enemy of the United States if disclosed without authorization." *Id.* at 695.

**19.** Defense counsel argues that defendant could not have acted with the intent to injure the United States because he attempted to meet with U.S. intelligence officials before travelling to China and voluntarily met with U.S. law enforcement officials after his return. Although this argument may have some purchase with a jury, it is, at this stage, and on this record, unpersuasive. Notably, defendant is alleged to be well-trained in spy tradecraft and counter-intelligence. It is wholly reasonable to believe defendant made these contacts to U.S. officials to cover his tracks in case he was caught. His text messages to PRC1 and his act of transmitting top secret information to PRC1 in exchange for cash belies defense counsel's argument that defendant never intended to injure the United States. In addition, the evidence presented thus far indicates that defendant was dishonest during his voluntary interviews—a fact that further undermines defendant's contention.

tionally, the CIA also attested that one of the documents included "specific details as to how [a] hostile foreign intelligence services approaches counter-operations." *Id.* The CIA also noted that another document found in defendant's home during the FBI's search comprised "handwritten notes concerning sensitive human sources." *Id.* That FBI investigators discovered classified documents in a hidden, micro-SD card during a search of defendant's home simply corroborates the allegation that defendant transmitted, or attempted to transmit, NDI to the Chinese intelligence officer.

Finally, the government has offered evidence that defendant and purported Chinese agents exchanged text messages on the phone PRC1 gave to defendant. These incriminating text messages blatantly discuss the sale of classified documents. In one message, defendant texts PRC1 the following statement: "[Y]our object is to gain information, and my object is to be paid for [it]." (Doc. 2 at ¶ 40.) This statement, coupled with the CIA's confirmation that defendant transmitted at least one document to PRC1 that contained NDI, would support a § 794 conviction.

In sum, at this stage the weight of the evidence against defendant is significant and substantial, and thus increases the risk that the defendant will flee.

**3.**

The history and characteristics of this defendant also indicate that he is a serious risk of flight. Defendant's profession and skills point strongly to the conclusion that he could flee, evade capture, and circumvent even the most stringent pretrial conditions. There is no question that defendant is a trained and seasoned intelligence operative with skills and tradecraft that would help him flee and evade capture; he has served as a U.S. Army officer, a State Department Security officer, a CIA agent, and a DIA agent. FBI investigators even discovered fake wigs, mustaches, and make-up kits in his home, which he received from the CIA or DIA.[20] More troubling, defendant has close association with the very country that he purportedly sold secrets to: He speaks fluent Mandarin, his wife is Taiwanese, he has spent significant amount of time in China, he has at least $6,500 in a Hong Kong bank, and likely has unknown other foreign bank accounts given his text message to PRC1 where he asks that deposits be made into a foreign account under an alias.[21] On top of all of this, China does not have an extradition treaty with the United States, which would inhibit the government's ability to extradite defendant should he flee to China. Finally, defendant has little financial

---

20. Defense counsel's argument that these fake wigs and mustaches were for Halloween costumes is unpersuasive test in light of the facts that these wigs and mustaches are CIA-grade materials and that defendant has the particular skills to fashion a convincing disguise. Defense counsel's other argument that these materials were innocuous remnants of defendant's long-past CIA training is equally unavailing. No matter the circumstances of how or when defendant received these materials, it is undisputed that he possessed both the items and skills to disguise himself. A permissible and persuasive inference can be drawn from this evidence that defendant kept these mate-

rials to aid in his escape should his illegal activities ever be discovered.

21. Defendant proffered that he could access those funds only when physically in China. But that proffer, does not assuage the substantial and well-founded concern that the Chinese intelligence officers that have already paid defendant tens of thousands of dollars may well assist defendant in fleeing to China. Nor does defendant's proffer regarding one of his overseas bank accounts address the evidence that defendant instructed PRC1 to place funds in different bank account for defendant to access with an alias.

incentive to stay in the United States. Although he owns a home in Virginia, it is currently under water and foreclosure is imminent, as defendant is five months in arrears on the mortgage. He has no other significant assets in the United States that would tie him to this country. To be sure, defendant does have close familial relationships with his wife and children.[22] As noted above, however, his wife is originally from Taiwan and she, like defendant, speaks Mandarin Chinese fluently. It also appears that his children understand some Mandarin Chinese,[23] which reinforces the reasonable conclusion that defendant could easily restart his life with his nuclear family in China. Even taking into account defendant's personal characteristics that tie him to this country, those characteristics are outweighed by others that create a significant risk of flight.

Finally, it is worth noting that defendant has submitted letters from members of his community. From those letters, it appears that defendant is well-respected by his neighbors and members of a predominantly Chinese-speaking church. But the fact that defendant is well-liked within his community does not outweigh the other facts that point to the undeniable conclusion that defendant has substantial incentives to flee and significant skills to do so successfully. In sum, not only does defendant have the incentive to flee, but he has the skills and contacts to do so successfully and permanently.[24]

### 4.

■ The final factor in considering flight risk is whether defendant is a danger to the community. For the reasons stated above, it is inescapable that if defendant were to flee to China or any other country, he could pose the gravest of risks to American assets abroad and citizens here at home. In particular, CIA Officer Shiner confirmed that defendant possesses sensitive information—state secrets that, based on the evidence presented, defendant is willing to divulge—that could cause harm to clandestine intelligence sources, to say nothing of the grave danger facing the agencies themselves and the United States as a whole.

For all of these reasons, the Court finds, based on the statutory factors, that the government has offered more than sufficient evidence to show by a preponderance, that "no condition or combination of conditions ... will reasonably assure ... "the appearance of [defendant]." 18 U.S.C. § 3142(e)(1). In short, none of the proposed conditions of release articulated in 18 U.S.C. § 3142(c)(1)(B), or any others, can reasonably assure defendant's appearance at trial. Defendant's flight risk, alone, would be a sufficient ground for requiring pretrial detention.

### B.

■ The government, in addition to showing that defendant poses an unreasonable risk of flight, has also proven by clear and convincing evidence that defendant presents an unreasonable risk of danger to the community. In this respect, § 3142 requires examination of the same four factors listed above: (1) the nature and circumstances of the offense charged; (2) the

---

22. Although defendant has siblings in the United States, these relationships to not appear to be particularly close.

23. It appeared from defendant's jailhouse call to his family that his children understood both English and Mandarin.

24. Given its obvious incentives to do so, it is not unimaginable that the government of China, with its substantial resources, would assist the defendant's flight from this country.

weight of the evidence; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community that would be posed by defendant's release. Here, the government's burden is by clear and convincing evidence.

As the above analysis suggests, the government has also met its burden with respect to showing that defendant is a danger to the community. To reiterate: defendant has been charged with espionage, a serious offense that, if proven, shows that he transmitted information to a foreign government that could be used to harm or kill intelligence officers and damage national security. Moreover, the NDI he obtained through his decades of government employment, his apparent desire to sell those secrets to a foreign government, and defendant's skills in tradecraft all show that he poses a grave risk of endangering not only one person, but the U.S. itself.[25] These are risks the Bail Reform Act does not tolerate.

Put simply, the government has shown by clear and convincing evidence that defendant poses a danger to both specific individuals and the community as a whole and that no condition or combination of conditions can reasonably assure the safety of the community.[26]

## IV.

Although pretrial release is the norm, this is not a normal case. Espionage is a uniquely serious crime that generally involves sophisticated defendants with special, and oftentimes unlimited, financial, logistical and intellectual resources to assist in their flight. Defendants accused of espionage also generally pose a special danger given these defendants often possess sensitive information related to national defense that if disclosed could not only cost the lives of individual agents, soldiers, officers and diplomats stationed abroad, but in a very real sense could cost the lives of American citizens here at home. In these circumstances, courts are not required to fashion conditions that would erect a virtual prison around the defendant. *United States v. Tortora*, 922 F.2d 880, 887 (1st Cir. 1990) ("[T]he Bail Reform Act... does not require release of a dangerous defendant if the only combination of conditions that would reasonably assure societal safety consists of heroic measures beyond those which can fairly be said to have been within Congress's contemplation."). Not surprisingly, then, district courts throughout the country have detained criminal defendants under similar circumstances.[27] So, too, here: defendant must be detained pending trial.

**25.** To be sure, the American intelligence community would face significant harm if its sources and methods were exposed to a foreign adversary. The CIA confirms that defendant possessed information about the CIA's sources and methods, which are the valuable resource any intelligence agency possesses.

**26.** Even if the Court was to impose the most onerous conditions imaginable, individuals could still visit the defendant at his home and he could find clandestine ways to access unmonitored telephones or computers. He could also simply pass information to Chinese intelligence officers using a seemingly innocuous third-party intermediary. Consequently, there

are simply no conditions that can reasonably assure the defendant will not pass national security information to a foreign adversary.

**27.** *See, e.g., United States v. Soueid*, No. 1:11–cr–494, 2011 WL 5027695 (E.D. Va. Oct. 28, 2011) (detaining defendant accused of acting as an agent of Syria while in the United States); *United States v. Nozette*, No. 09–cr–276, 2009 WL 6707289 (D.D.C. Nov. 9, 2009) (Detention Memorandum) (finding that an espionage defendant posed an unreasonable risk of harm to the community because, *inter alia*, he allegedly "attempted to transfer some of our nation's most guarded and sensitive secrets"); *United States v. Pitts*, No. 96–cr–

Therefore, for the foregoing reasons, for the reasons stated from the Bench, and for good cause,

It is hereby **ORDERED** that the government's motion to revoke defendant's bond pending trial is **GRANTED** and that defendant shall be **DETAINED** pending trial.

It is further **ORDERED** that defendant is committed to the custody of the Attorney General or his designated representative for confinement in an appropriate corrections facility and, to the extent practicable, separate and apart from persons awaiting or serving sentences or being held in custody pending appeal.

It is further **ORDERED** that defendant shall be afforded a reasonable opportunity for private consultation with his counsel.

It is further **ORDERED** that upon an order of a court of the United States or on request of an attorney for the government, the persons in charge of the designated corrections facility shall deliver the defendant to the United States Marshal for the purpose of an appearance in connection with a court proceeding.

It is further **ORDERED** that the government is **DIRECTED** to take appropriate steps to have defendant promptly returned to this district for arraignment.

The Clerk is directed to send a copy of this Order to the Marshals Service, the Pretrial Services Office, and all counsel of record.

483 (E.D. Va. December 23, 1996) (detaining a former FBI agent who was accused of attempting to pass NDI to a KGB agent in violation of 18 U.S.C. § 794(a)); *United States v. Lee,* 79 F.Supp.2d 1280, 1285–88 (D.N.M. 1999) (concluding that a defendant charged with violating 18 U.S.C. § 793 by downloading sensitive information on the United States' nuclear weapons program posed an unreasonable danger to the community given, *inter alia,* (i) the nature of information defendant possessed, and (ii) the fact that defendant apparently lied, during voluntary interviews with the FBI and U.S. government agents, about defendant's meetings with Chinese "nuclear weapons scientists and officials" from the PRC); *United States v. Cole,*

715.F.Supp. 677, 679–80 (E.D. Pa. 1988) (revoking bond on flight-risk grounds because the defendants (i) previously stated an intent to flee, (ii) had "the knowledge, ability and resources to assume new identities and to travel outside this country without being detected by U.S. authorities" and (iii) "the evidence of espionage," which further suggested "the defendants' ability to flee before trial"); *United States v. Michelson,* 607 F.Supp. 693, 697 (E.D.N.Y. 1985) (denying a motion for release on bail in an espionage case because, *inter alia,* "there [wa]s no extradition treaty between the United States and" the relevant countries to which the defendant allegedly attempted to transmit NDI).